[No. 3660.]

HARDY v. SWIGART, TRUSTEE.

1. CORPORATIONS—REORGANIZATION—FRAUD—ESTOPPEL.

Upon the reorganization of a corporation a creditor and stockholder was induced to enter into the reorganization and to accept stock in the new corporation in lieu of his note and stock in the old corporation, by a secret agreement between himself and two other stockholders and directors, whereby they agreed to buy his new stock at a fixed price, and also agreed that he should hold the note of the old corporation until they signed the agreement to purchase his stock; and relying upon his action in accepting the new stock, other creditors and stockholders of the old corporation surrendered their notes and stock, and said stockholder was chosen as a director of the new corporation, and as such director assisted in procuring a loan for the new corporation. Although his action was induced by the fraud of the other two directors, who never intended to sign the agreement to buy his stock, inasmuch as his own acts were a palpable fraud upon other stockholders and the person from whom the loan was obtained, as against them he is estopped from saying that his note and mortgage against the old corporation is still unpaid.

2. PLEADING AND PRACTICE—DEMURRER—WAIVER.

Error, if any, in overruling a demurrer to a complaint on the ground of

nonjoinder of parties, is waived by answering and going to trial on the merits.

3. PARTIES—MORTGAGES—FORECLOSURE.

Under section 5, civil code, a trustee in a deed of trust may maintain an action of foreclosure without joining the beneficiary in the deed of trust as a party, and a defendant claiming a prior lien cannot complain that the beneficiary was not made a party.

*Error to the District Court of Clear Creek County.*

THIS action was brought by H. M. Swigart, as trustee (defendant in error) to foreclose a trust deed on the West Santa Fé mining lode, situate in Clear Creek county, Colorado, securing a note of $3,500 given by the Fortunatus Gold and Silver Mining Company to George E. McClelland, and by him transferred to Solomon Favinger, the present holder. As additional relief the plaintiff asked to have a certain other trust deed of earlier date and covering the same property adjudged a subsequent lien thereto.

The defendants in the suit were the mining company (the maker of the note), Henry Plummer, as trustee in the prior trust deed, and John Trathen, John Manhire and John D. Hardy, the beneficiaries. All the defendants made default except Hardy, who filed an answer and cross-complaint wherein he alleged that he was the beneficiary under the prior trust deed, and that the debt thereby secured was a valid indebtedness, and asked for the foreclosure of his trust deed.

The trial court found all the issues of fact in favor of the plaintiff, and, among other findings, was one that the notes secured by the Hardy trust deed had been paid; and thereupon a sale of the premises under the Swigart trust deed was ordered.

From the admitted allegations of the pleadings and the evidence in the case, in which there is not much serious conflict, it appears that prior to the 30th of July, 1892, Hardy, Manhire and Trathen were the owners of the West Santa Fé mining claim. On the day they sold it to the defendant mining company for a consideration of $25,000 of which $1,000 in cash was paid, and 6,000 shares of the capital stock

of the company given, to each of the owners, and the company executed and delivered to each of them its four promissory notes in the principal sum of $1,083.33⅓ each, aggregating $13,000, and secured these notes by a trust deed of the property, in which Henry Plummer was the trustee. The first of the four notes held by each of the grantors was paid at maturity.

The company worked the mine until about the first of February, 1893, and in its operation incurred, among other indebtedness, the sum of $3,250, which was represented by notes then held by John P. Duncan, none of which was it able to pay. To relieve the company of all its outstanding obligations and to provide a fund for working the mine, the stockholders, or some of them, outlined what they called a plan of reorganization and remodeling of the corporation, which was formally drawn up and dated as of February 1, 1893, and presented at a meeting of the stockholders held at Idaho Springs, Colorado, on that date, for their signatures. The parties of the first part to this agreement were the company creditors, Hardy, Manhire, Trathen and Duncan, who were also stockholders, and the parties of the second part were the company itself, and all the other stockholders. The contract was not to be binding until executed by the holders of all the stock, aggregating 75,000 shares.

The provisions of this plan of reorganization, as evidenced by this written agreement, so far as material to this controversy, were that Hardy, Manhire and Trathen, as the original owners of the property and the beneficiaries under the trust deed, and Duncan, as an unsecured creditor, should, and, by the terms of the writing, they did agree to, surrender to the company for cancellation by it all its promissory notes which they held, and release the trust deed securing the same, and surrender for cancellation the stock of the company held by them, and, in lieu thereof, accept a certain number of shares of the capital stock of the company (practically all the shares) to be issued upon the cancellation of the surrendered notes and stock. They further agreed to turn over to the other

stockholders certain shares of the new stock issued in their names, the amount to be determined by the respective holdings of the original stockholders, and certain other shares to the treasurer to be sold as treasury stock to provide a fund for paying the other debts of the old company, and for developing the mine. The other stockholders of the company (parties of the second part to the agreement) in consideration of the foregoing agreed to return and surrender to the company all the shares of stock held by them to be canceled by the company.

At the meeting of the stockholders at which this contract, embodying the plan of reorganization, was submitted, all the stockholders were present, either in person or by proxy. Hardy manifested an unwillingness to sign it, fearing, as he says, that some scheme was being proposed that would result in his injury. The meeting was in session throughout the day, and at some stage in its progress, not very definitely fixed by the evidence, in company with George R. Chaney, who was the president of the company, and John P. Duncan, one of the stockholders and directors, Hardy went to the office of his attorney in the same town, and there was then drawn up by his attorney a separate and distinct agreement, dated as of the 28th day of January, 1893, which provided that John P. Duncan, George R. Chaney, Henry Favinger and Solomon Favinger should purchase from Hardy all of the stock to which he would be entitled under the plan of reorganization, to wit: about 18,000 shares, and pay him therefor $3,250, to be evidenced by four notes, which was about the amount of the notes which he held against the old company.

As a part of this agreement, though not embodied in the writing, Hardy testifies, and such seems to be the fact, that Duncan and Chaney consented that he should retain his notes against the company until this new agreement of January 28, was signed by the proper parties and delivered to him. This agreement, however, was not signed by anybody, and it is clear that Duncan and Chaney never intended to sign it, and never had any authority from the other parties to the agree-

ment to sign such a writing, but their only object in promising to do so was to get Hardy to sign the agreement of February 1; and it is likewise clear that this inducement held out to Hardy by Duncan and Chaney was what led to his signing the stockholders' agreement. The evidence is also clear that of all the stockholders the only ones cognizant of this second agreement were Hardy, Chaney and Duncan, and that these three agreed among themselves that knowledge of it should be withheld from the other stockholders, especially from Trathen, who was acting for himself and Manhire; for they knew that the others would not sign the stockholders' agreement, if this side agreement of January 28, was known to them.

After this agreement of January 28, was entered into between Duncan, Hardy and Chaney, they returned to the place where the stockholders' meeting was being held, and Hardy, as did all of the other stockholders, then signed the so-called stockholders' agreement. Trathen was present, representing himself and Manhire, and as Hardy did not present his notes for cancellation Trathen asked him about it, and Hardy said that he did not have them with him, but they were at his house, and he would shortly hand them to the secretary or attorney of the company for cancellation. Upon this assurance, and upon the signing by Hardy of the stockholders' agreement, all of the other stockholders surrendered their stock, which was canceled, and the notes of Trathen and Manhire were also surrendered by them and canceled by the company, and then each stockholder, including Hardy, received his allotment of the new issue of stock as provided by the plan of reorganization.

It appears, also, that Chaney and Duncan intended to prevent any possible future action by Hardy that would interfere with the plan of reorganization, and so they secured the resignation from the board of directors of Henry Favinger, and an appointment of Hardy to the vacancy thus caused.

The board of directors held a meeting at the same time and place, and Hardy, after his election as a member of the

board, as just stated, participated in the meeting; and while he was present, among other business transacted was the adoption of a resolution authorizing and directing a loan to be made in the sum of $3,500 to take up a note of the company in the sum of $2,500, and for an additional $1,000 to be used in working the mine. Of the stockholders who signed this agreement of February 1, was George E. McClelland, who was cashier of the First National Bank of Idaho Springs which then held the $2,500 note against the company. He knew of Hardy's assent to the reorganization plan, and that he was present, as a director, when the resolution of the board was adopted authorizing such loan to be made. Thereafter, and on the same day, the company, in pursuance of the resolution, borrowed of George E. McClelland, as cashier, the sum of $3,500, and gave its note therefor, which is the note secured by plaintiff's trust deed.

Claim is now made by Hardy that Chaney and Duncan in fraudulently inducing him to sign the stockholders' agreement, were acting for and in behalf of the company; but if they were not, and on the contrary, were acting in their individual capacity, the subsequent act of the company in knowingly ratifying what they had done, and in accepting the contract procured through their fraudulent representations made the fraud that of the company, and therefore the company's indebtedness represented by the notes in question has not been paid, but remains a valid and existing indebtedness against the defendant company.

Messrs. MORRISON & DE SOTO and Messrs. BULLIS & REGENNITTER, for plaintiff in error.

Mr. C. H. TANNER, for defendant in error.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

The foregoing statement of facts furnishes a complete answer to the contention of the plaintiff in error. It is seldom

indeed that a record abounds in so many satisfactory reasons for the decision of the trial court, and the embarrassment here is in the selection of the grounds upon which to affirm the judgment below.

That Hardy's execution of the stockholders' agreement of February 1, if untainted with fraud, operated as a payment and cancellation of his notes, is admitted. The only fraud charged is that Chaney and Duncan fraudulently procured his signature to that agreement. Whether he has a cause of action against them is not a question here, and we need not determine it. In entering into this stockholders' agreement the stockholders were acting in their individual capacity as stockholders. It is true that the company was a party to the agreement, though merely a nominal one, and the only thing it had to do was to give its formal consent as a corporation to the plan of reorganization and to carry out the directions of the stockholders therein contained.

In securing plaintiff's signature to this agreement Chaney and Duncan, who were but two of the five directors, were not acting for the board, or the stockholders. They did not pretend so to act, and Hardy knew that they had no such authority to make any promises, or to hold out to him any inducements, other than those contained in the stockholders' agreement which was signed by the other stockholders of which all were advised.

But if Chaney and Duncan could be considered as the representatives of the company, Hardy was just as much its representative as they were. And if it be conceded that they have perpetrated a fraud upon him, he himself is guilty of a fraud upon his other associates in concealing from them, when it was his duty to speak, knowledge of a transaction had between him and two other stockholders. In concealing from Trathen and Manhire, his two former co-owners, and all the stockholders, except Duncan and Chaney, joint wrongdoers, knowledge of this agreement with Duncan and Chaney, one of whose provisions contemplated that he should retain his notes against the company until this separate agreement should be

delivered to him; in falsely stating to Trathen when he signed the stockholders' agreement that he did not have his notes with him, but would deliver them subsequently to the secretary or attorney of the company, upon the strength of which statement the others relied and delivered up for cancellation the notes and stock of the company held by them;—he perpetrated a palpable fraud of which he should not now be allowed the advantage. They would not have delivered their notes and stock had they known of this fraudulent side contract. The cashier of the bank which loaned to the company the money, represented by the note in suit, was a stockholder of the company, and signed this stockholders' agreement. He knew of Hardy's signature thereto, but knew nothing of the separate agreement he had with Duncan and Chaney. Upon the strength of this signature of Hardy, and upon the knowledge of the fact that he acted as a director and participated in the meeting when this loan was authorized, the money was advanced, and plaintiff is now estopped to set up, as against the holder of this note, his notes which he agreed to surrender.

Whatever may be said as to Hardy's remedy (if any) against Chaney and Duncan, his equities under his trust deed securing his notes are junior to the equities of all the other stockholders, and to the company, and to the rights of the present holder of this note, who bought it from an innocent holder, in good faith, and for a valuable consideration, and (although after maturity) without any knowledge of the alleged fraud.

An additional point is made by plaintiff in error that there is a defect of parties plaintiff in that Solomon Favinger, the beneficiary under the trust deed to foreclose which this suit is brought, was not made a party plaintiff. This was the ground of a special demurrer, which was overruled; and the ruling cannot now be questioned by Hardy for several reasons: first, Swigart is the trustee of an express trust, and is authorized to maintain this action under section 5 of the civil code; were this not so, the fact that, after the demurrer was overruled, defendant Hardy answered and went to trial

upon the merits is a waiver of the ground of demurrer, which appeared on the face of the complaint. Bliss on Code Pleading (2d ed.), § 417; *Fillmore v. Wells,* 10 Colo. 228; *Elliott v. Field,* 21 Colo. 378; *The Sams Automatic Car Coupler Co. v. League, ante,* p. 129. Besides, in no event, is this ground of demurrer available to Hardy. If it is to any of the defendants, it is only to the defendant mining company, which made a default; and if it consents that the amount of its indebtedness to Favinger shall be ascertained, without his presence in court, Hardy may not complain.

Upon the entire record we are satisfied that the findings and decree of the court below are in all respects right, and the judgment is accordingly affirmed.

*Affirmed.*