## No. 13,280.

Dollar Building & Loan Association *v.* Shields.

(27 P. [2d] 485)

Decided October 9, 1933.   Rehearing denied November 27, 1933.

Messrs. STRACHAN & HORN, Mr. CHARLES H. SMITH, for plaintiff in error.

Mr. J. E. LITTLE, for defendant in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

THE plaintiff in error was defendant in the trial court and for convenience here, the parties will be referred to as Shields and the association.

In February, 1932, Shields filed his complaint alleging the existence of the association as a corporation under the Colorado laws doing business in El Paso county; that on the 1st day of December, 1924, Shields loaned the association the sum of $3,000, and that the association delivered to him at that time an instrument in writing as follows:

"The Dollar Building and Loan Association
"Seven Per Cent. Certificate
"Colorado Springs, Colorado, December 1st, 1924.

"J. A. Shields has deposited with The Dollar Building and Loan Association Three Thousand and No/100 Dollars payable to the order of J. A. Shields or E. A. Shields, on return of this certificate, properly endorsed, any time on demand from the date of this certificate, providing thirty days notice of such withdrawal is given, interest payable semi-annually, at the rate of seven per cent per annum.

"The Dollar Building and Loan Association
"(Seal)      By E. C. Sharer, Secretary-Treasurer."
"Nov. 10 1931 Pd. on this certificate $500.00." That on the 10th of November, 1931, $500 was paid on said in-

debtedness and that on the 5th of December, 1931, he served notice on the association in writing giving the association thirty days' notice of his intention to withdraw the balance of $2,500 with interest from July, 1931, and that the association refused payment.

The association demurred to this complaint and after same was overruled, answered admitting issuing a 7 per cent certificate, and the payment of $500 as alleged; admitted the giving of notice by Shields of his intention to withdraw the balance and that the same had not been paid to Shields, but alleged that the said certificate when issued was subject to the provisions of section 2792 of the Compiled Laws of the state of Colorado and the amendments contained in chapter 72, section 1 of the Session Laws of 1927, and was subject to the by-laws of the said association and particularly article 3, section 4 and article 3, section 12, which are as follows:

"Article III, Section 4. Withdrawals. Payments upon installment stock which has not been pledged · as security for a loan, may be withdrawn upon giving thirty days notice in writing to the Board of Directors and upon withdrawal, the holder shall receive all of his monthly installment payments made thereon, together with all dividends credited to same, less the cancellation fee, fines and other lawful charges. The Association shall not be required to pay out upon withdrawals during any one month, more than one-half of its receipts from installment stock for that month. Advance payments and prepaid stock may also be filed for withdrawal upon like notice, and will be liquidated in accordance with its terms and these By-Laws. The Association shall not be required to pay out during any one month, upon withdrawals of such shares, more than one-third of the receipts from installment stock for that month. Stock filed for withdrawal will be liquidated according to priority of filing, and without regard to class or series of stock shares filed for withdrawal or retirement. All shares forfeited will revert to the association and new

shares may be issued in lieu thereof, but at no time shall the shares outstanding exceed the aggregate number of shares into which the capital stock of the Association is divided.''

"Article III. Section 12. Advance Payment Stock. The Association may issue advance payment stock upon advance payments of fifty dollars ($50.00) per share to which shall be credited the regular dividends declared by the Association. When sums paid in and dividends accruing upon such stock shall aggregate one hundred dollars ($100.00) per share, such stock shall be deemed matured, and the holder of such stock shall have the right to withdraw same at any time upon thirty days' notice in writing to the Board of Directors upon the same terms and conditions as installment stock, and the Association may also accept payment for the full par value of stock and issue to such subscriber a Certificate of Fully Paid Stock, together with Pass Book, or may issue a Certificate of Deposit, bearing such rate of interest, payable semi-annually, as the Board of Directors may from time to time direct.''

The association further alleged that said certificate issued to Shields represented a full paid stock subscription and could only be withdrawn in accordance with the laws of the state and the by-laws of the association and that at no time since the withdrawal notice was given the association, had the association been in position to pay the balance to Shields, if it did so according to the statutes and by-laws concerning withdrawals from the association. It further alleged that on the 8th of April, 1932, the building and loan commissioner of the state of Colorado declared the defendant association insolvent and impounded its assets and ordered that no payments be made upon accounts on which notice of withdrawal had been given. Thereafter Shields filed his reply.

On June 1, 1932, a jury was impaneled and at the close of the trial both parties moved for a directed verdict and the jury was discharged. The court sustained

Shields' motion for a directed verdict and entered judgment in his favor against the association for $2,660.38 and costs, to which judgment the association brings error, which error is assigned under five assignments in substance as follows: Error in overruling association's demurrer to Shields' complaint; error in overruling the association's motion for a nonsuit and in denying association's motion for directed verdict, and in granting Shields' motion for directed verdict and the entering of the judgment.

Under the pleadings in this case, there is but one question to be determined, namely: Was this a loan by Shields to the association or was it a subscription for fully paid stock in the association?

The evidence in the case on behalf of both parties is undisputed. Shields testified in his own behalf and Ruth Smith, as secretary, testified for the association. Briefly, Shields said he had some money that he wanted to put out at interest; that he talked with Mr. Sharer of the association, told him that he would like to loan $3,000 and be in position to get it at any time he needed it; that Sharer told him they could use it and Shields could get his money any time he wanted it; that the usual requirement was the giving of 30 and 60 days' notice, but that the association did not go by that, and that he would give Shields 7 per cent and make the loan on demand; that thereupon the certificate (herein set out) was issued and delivered to him and that there was never anything said by Shields or Sharer about any stock in the association; that he had never heard of any such thing as stock in the association and did not know there was stock to sell by the association; that he received the interest regularly until December, 1931; that he never received a pass book from the association and that nothing was said to him about a pass book; that he was receiving no loan from the association. Shields identified the original instrument issued to him at the time he claimed to

have loaned the money, it being Exhibit A which has been herein set out.

Ruth Smith, as secretary for the association, testified that she had been connected with the association since 1927, and was familiar with the account of Shields; that the account was carried on the books of the association as a fully paid account and that dividends were paid thereon; she identified association's Exhibits 1 to 15, being checks marked "dividends," payable to Shields, and the original ledger sheet showing Shields' account. She further testified that no pass book or stock was issued to Shields; that the association kept a register of stock issued, and that the certificate issued to Shields at the time he deposited the money was the only written instrument issued by the association to evidence the deposit.

Sharer, who had the original transaction with Shields and signed the instrument as secretary-treasurer of the association contends that if his remarks in the original conversation with Shields established dealings contrary to those provided for in the statutes or the articles of incorporation and the by-laws, that such a change would not be binding on the association. The association contends that the transaction was not a loan but a fully paid stock subscription.

The instrument showing the transaction between Shields and the association, on its face, rejects any reasonable conclusion that it represents a fully paid stock subscription. In our opinion, it is a certificate of deposit, payable to the order of Shields on return of the endorsed certificate at any time on demand, providing thirty days' notice is given, and provides for interest payment. It is in substance and effect a promissory note and when issued to Shields, he became the creditor of the association and the association his debtor.

The by-laws as herein set out prescribe the dealing to be had with a subscriber. Article 3, section 12, provides that the association may issue a certificate of

deposit bearing such rate of interest, payable semiannually, as the board of directors may from time to time direct, but that is in connection with the right of the association to accept payment for the full par value of stock to be issued to the subscriber. A subscriber puts his name to something evidencing the transaction or assents to some course of dealing made known to him.

■■ There is nothing in the evidence or in the record in this case or on the face of this certificate that indicates in the slightest degree that Shields subscribed for any shares of stock in the association or that any such matters were made known to him or that he assented in any way to the benefits or liabilities of a shareholder in this association. It was within Shields' power at all times, as the owner and holder of this certificate, to make it due and payable by his own act of giving a thirty-day notice. He was justified in believing that the officer with whom he was dealing was acting within his authority in borrowing his money and issuing the certificate. It is an executed contract, and after the association has received the benefits, if any, or was in a position to receive the benefits over a long period of time, it is estopped to deny the authority of its officer to enter into such a contract. It sought the benefits from the transaction and cannot now assail same as ultra vires.

■ The acts of the officer in this case, if allowed to stand, were the acts of the association and it is liable to Shields therefor because of its remaining inactive. We are of the opinion that Shields is in the position of a general creditor of the association.

Association's Exhibit 15 discloses that Shields' account was carried on the general ledger of the association as a "demand account." The copy of association's Exhibit 15 contained in the abstract of record filed by the association shows the matter to have been carried on the loan ledger of the association and is silent on the matter of demand.

■ Shields testified that he received interest on the

interest paying dates for about seven years. The association's Exhibits 1 to 14, inclusive, are cancelled checks showing payment to Shields of an amount substantially the same as would be due him under the terms of the certificate. These checks are marked "dividend," which is of no particular consequence, since Shields had no notice of the plan of bookkeeping followed by the association in such matters and was therefore not bound thereby. The laws of this state (section 2794, C. L. '21) governing building and loan associations permit the association to negotiate long or short term loans, and on the face of the transaction in this case, Shields had a right to assume that the association had borrowed his money, and when he received interest payments thereon, no duty devolved upon him to inquire into or ascertain the manner or means used by the association in payment.

The finding of the trial court was right and its judgment is affirmed.

MR. JUSTICE BOUCK dissents.

MR. JUSTICE BOUCK, dissenting.

In this case I cannot agree with the foregoing opinion. The latter holds that the "certificate of deposit" involved herein—which was issued to the defendant in error Shields by the Dollar Building and Loan Association, plaintiff in error, and which forms the basis of the action—evidences a debt and not membership in the association. Considered in the light of our statute on building and loan associations, as well as in view of the evidence presented by the record, as hereinafter shown, that holding seems to me erroneous. It is common knowledge that the association is now in the hands of a receiver. If the holders of the Shields "certificate of deposit" and other like "certificates" are adjudged to be creditors, and not members, of the association, it is a foregone conclusion that the claims of such "creditors" together with the claims of real creditors, will eat

up the remaining assets. The direct result would then be that the holders of the various classes of stock, other than such fully paid stock as I believe to be represented by the "certificate of deposit," must necessarily lose all they have paid in to the association. Such a consequence seems to me a strange perversion of the building and loan idea underlying our statute and similar statutes throughout the world.

By C. L. '21, §2792 (and its amendment in S. L. '27, page 244, §1) it is provided that such an association "may issue and sell its shares of stock in one or more successive series, *or upon the permanent or Dayton plans,* * * * either fully or partially paid up in periodical or other installments, or upon all, either, or any of these plans and with or without full participation in the earnings of such association, or partially in limited dividend-bearing stocks as may be provided by the by-laws of such associations * * *." The by-laws of any such association and all amendments thereof are required to be filed in the office of the clerk and recorder of the county where it does its principal business. That those who undertake to deal with a building and loan association in Colorado are thus charged with notice both of the general statute and of the by-laws adopted by the particular association appears to me a matter of course under well-known legal principles needing no citations to support them. The knowledge so imputed is established, not by a rebuttable presumption, but by a conclusive presumption, a presumption of law.

Section 12 in article 3 of this association's by-laws, in force when Shields received his "certificate of deposit," and quoted in full in the majority opinion herein, provides: "* * * the Association may also accept payment for the full par value of stock and issue to such subscriber a Certificate of Fully Paid Stock, together with Pass Book, *or may issue a Certificate of Deposit, bearing such rate of interest, payable semi-annually, as the Board of Directors may from time to time direct.*" (Italics

here and elsewhere are mine.) Section 4 of the same article, also quoted in full in the majority opinion, reads in part as follows: "* * * *Advance payments and prepaid stock may also be filed for withdrawal upon like notice* [namely, a thirty days' written notice to the board of directors], *and will be liquidated in accordance with its terms and these By-Laws. The Association shall not be required to pay out during any one month, upon withdrawals of such shares, more than one-third of the receipts from installment stock for that month. * * *."* From the plain language used in our statute, I gather that the association was expressly empowered to include in its membership the holders of any of the classes or series of stock enumerated therein, including such holdings as are on the permanent and Dayton plans, one or the other of which, if not both, would naturally include, I think, such transactions as are represented by "certificates of deposit" like the one before us. By the by-laws above quoted, the association has obviously exercised its powers, by adopting the provision for accepting payment of full par value and for the corresponding issuance therefor of either (1) "a certificate of fully paid stock, together with pass book," or (2) *as an alternative* "a certificate of deposit, bearing such rate of interest, payable semi-annually, as the Board of Directors may from time to time direct."

Since the judgment pronounced by the majority of the court is based upon the alleged fact that Shields's certificate evidences a loan to the association and not membership in it, I shall first address myself to the subject of "certificates of deposit."

1. "Certificate of deposit" is an expression found nowhere in our building and loan statute. The term becomes connected with the association by reason of a duly adopted by-law, which expressly makes a "certificate of deposit" one of two instruments equally authorized thereby to evidence "fully paid stock," as has been shown by the quotations above given.

Certificates of deposit, properly so called, are peculiar to banking, and are issued by banks or bankers. Ballentine, Law Dictionary, page 201, "certificate of deposit"; Black's Law Dictionary (2d Ed.), page 183, "Certificate —Certificate of deposit"; 1 Bouvier's Law Dictionary (Rawle's 3d Revision), page 442, "certificate of deposit"; 11 C. J., page 77, "Certificate of deposit"; 3 R. C. L., pages 570, 571, §§198, 200. Building and loan associations are not banks in states like Colorado, where a bank and a building and loan association respectively operate subject to their own separate statutory regulation under independent administrative structures and with entirely different right and liabilities. See C. L. '21, chapter 43, "Banks and Banking," pages 862 et seq., §§2653 et seq. (and amendments thereof); and C. L. '21, Chapter 44, "Building and Loan Associations," pages 886 et seq., §§2790 et seq. (and amendments thereof). In these circumstances a Colorado building and loan association has no right to do a banking business or to issue a certificate of deposit in the true sense. Such are reserved for the banks. 1 Morse, Banks and Banking (6th Ed.), page 696, §297.

The "certificate of deposit" involved herein, on the other hand, besides being issued by a corporation not a bank, fails for other reasons also to be a certificate of deposit *in the ordinary form,* and therefore cannot be deemed the equivalent of a promissory note. Thus, for instance, it contains a proviso ("providing thirty days notice of such withdrawal is given"), which not only changes it from the ordinary form and makes it conditional, but by the use of the word "withdrawal" directly ties it to the phraseology employed distinctively by building and loan associations with reference to their stock and not otherwise. This is definitely confirmed by the uncontradicted evidence in the case. The instrument, moreover, was not dealt with as an ordinary certificate of deposit, either by the association or by Shields. By way of example: Notwithstanding the fact that the

sum was made payable "on return of this certificate, properly endorsed," neither at the time of the $500 part payment on November 10, 1931, nor at any time since, has Shields endorsed it. Even if this were a *bank* certificate of deposit, no judgment could properly be predicated upon it; for, though it be assumed that such a certificate is equivalent to a promissory note, a rudimentary rule declares that an instrument requiring indorsement cannot be sued upon unless it has been indorsed. Moreover, Shields waited for over seven years before getting *a partial payment,* and then he asked and collected a comparatively small amount. Instead of procuring the issuance of a new "certificate of deposit" for the balance, and without indorsing, he retained the old certificate, and later gave a "notice of withdrawal." Such is not the behavior of a man who thinks he has made a straight loan. He treated his certificate as it would naturally be treated under the system of handling full-paid stock which was described by the witness Ruth Smith, then secretary of the association, and which is in conformity with the by-law creating "certificates of deposit" as one of two interchangeable modes of representing full-paid stock. To say that some one else who under that by-law had taken, not a "certificate of deposit," but a "certificate of fully paid stock" with a pass book, is a stockholder, and that those who, like Shields, took "certificates of deposit" are not, is to indulge in verbal acrobatics certainly not contemplated by the by-law itself but repugnant to the fundamental idea of equality underlying the building and loan associations here in Colorado and elsewhere. Let it be recalled that the only demand or notice coming from Shields was one of the customary withdrawal notices (see record, folios 69, 112, 113) given by withdrawing stockholders. He accepted at semiannual intervals numerous checks plainly marked "dividend." He received these dividends not at the rate of five or six per cent, but at full seven per cent per annum, carrying a strong implication that he was receiving high

interest, not as in an ordinary loan transaction, but by casting his lot in with the stockholders. Now Shields claims to have been a lending creditor, not interested as a member, nor in any way dependent upon the expected prosperity of the association. He urges that he is entitled to a creditor's priority over the other depositors and stockholders. Under the evidence, his was not the conduct of a man who can reasonably plead ignorance of the law governing building and loan associations. One cannot safely run counter to the simplest principles of business and common sense, and take everything for granted, in the expectation of benefiting by legal fictions.

As a matter of fact, the deposit of moneys with a building and loan association is a typical and widely-prevalent way of becoming a member of the association. Such a membership is a familiar one. Sundheim, Law of Building and Loan Associations (2d Ed.), page 48, §39. The question whether that form of membership is desirable is not a judicial question. It is in evidence here that the Shields certificate was like many others issued on such deposits (record, folio 127). Apparently the trial court attached importance to the failure of the association to give Shields a pass book. Such a pass book is not essential, however, under the by-laws; the delivery of it to the holder of a "certificate of deposit" would be purely optional, and evidently occurred, as the testimony indicates, only in the case of those who made the smaller deposits and who were likely to effect rather frequent withdrawals (record, folios 125, 128). In short, the deposit by Shields complied with the recognized practice of the association under the express powers conferred by the statute and a competent by-law. "Another important feature [of the Dayton plan] is the issue of certificates of paid-up stock [or, under the by-law here, of "certificates of deposit"], the face values of which are paid in at once, instead of being subject to weekly or monthly payments as ordinary running stock. * * * Paid-up stock is usually governed by the same rules regulat-

ing running stock, except that it is not issued at all times, and that the dividends, instead of being credited, are paid out in cash either annually or semi-annually. * * * Paid-up stock can be withdrawn just as running stock by giving the usual notice required, and is paid out with running stock in the order in which the notices for withdrawal were filed." Report of the Inspector of Building and Loan Associations, Ohio, 1892, pages 27 and 28. Having shown that the Shields certificate in all respects answers the requirements as evidence of full-paid stock, I now revert to the principle that only those certificates of deposit which are issued by a bank or banker *in the ordinary form* can be deemed equivalent to promissory notes. 5 U. L. A. 20, and cases there cited. Such equivalence results under the familiar principle that justice or equity requires resort to a fiction. But a court will not tolerate or extend a fiction where to do so would be unjust or inequitable; where it would destroy limitations imposed, as here, by specific statutes and authorized action thereunder, and particularly where a person, though charged like the defendant in error with notice that calls for reasonable investigation, has long stood idly by.

Since a building and loan association has no banking powers and therefore cannot issue a certificate of deposit within the purport of the law merchant, neither can one of its officers do so in its name. That is true wholly apart from the question of his actual or apparent authority as an agent. The majority opinion does not refer to the source of the association's authority for borrowing money. I assume that the court had in mind C. L. '21, page 888, §2794. This says that any Colorado building and loan *association* "may, *in such manner and to such extent within the limits hereinafter stated as may be provided in its by-laws,* negotiate for and receive such long time or short time loans *on note or bond,* as may be found necessary to advance the purposes of the association."

It will hardly be contended that, when a general statute empowers an *association* to "negotiate for and receive" loans "on *note* or *bond*" subject to and in accordance with its by-laws (required by law to be filed in a public office), it justifies the issuance of a *certificate of deposit* by one of its officers as evidence of a *loan*. When a general statute has created a special kind of corporation, one who loans money to it is charged with knowledge of its character, at least to the extent that such knowledge is available by perusing the public records to which the statute calls specific attention. We have no right to take a term expressly used in a by-law adopted in pursuance of a statute—as the term "certificate of deposit" was used in the by-law of this association—and force upon it another meaning by applying a convenient fiction in the face of language absolutely clear according to its context. Under the facts shown by the record, no consideration of law, justice or equity, can require or permit such a construction. On the contrary, every such consideration pleads here in favor of the fundamental rights of equality inherent in every building and loan association.

Furthermore, in basing its judgment upon Shields's certificate as evidence of a loan, the lower court has ignored the fact that the certificate was issued by the then acting secretary-treasurer of the association, upon whom Shields then and there called of his own volition and without having met the officer before. Such an officer has no implied power to borrow money for the association. Fletcher, Cyclopedia of the Law of Corporations (revised and permanent edition), vol. 2, page 567, §640, and page 593, §659. Not even a general manager has the implied power to bind his corporation by executing a promissory note or other negotiable paper. Id., page 642, §680. And certainly the phrase "note or bond" in §2794 of C. L. '21, above quoted, must be taken to mean negotiable paper issued with more formality than was used in this instance, *unless the "certificate of*

*deposit" was, as I believe, issued as the symbol for full-paid stock, and not to evidence a loan.* On either horn of the dilemma, Shields fails to qualify as a creditor of the association.

The majority opinion is in error when it holds, as it seems to hold, that the word "subscriber," as used in the by-laws, necessarily implies subscribing in writing. Such is not the tenor of the authorities as I read them; nor would such a view satisfy the elementary principles of documentary interpretation when applied to the facts of this case.

This court, I realize, has been at a distinct disadvantage because of certain gaps in the evidence due largely to what seem to me too rigid restrictions placed upon counsel for the association when he tried to introduce testimony bearing on the methods of the association, as used in connection with the Shields and similar certificates, and Shields's knowledge of those methods (record, folios 71, 78, 79, 87, 89, 96). Enough trickled through, however, to qualify and contradict his claim of ignorance of the association, when he admitted that he himself had other dealings with it, including his own handling of his son's stock in this association before he made his $3,000 deposit (record, folios 72-3, 80). It all goes to show, I think, that, while it was still fair weather for our building and loan associations, Shields got into the same boat with the smaller investors, not dreaming then that after seven long years they would all be upon the rocks.

Truly do I regret the length of this dissenting opinion, prepared all too hastily amid the necessary pressure of other official labors. I submit that, under the evidence as it stands, and keeping in sight the spirit and purpose of the building and loan principle of equality and justice, the court ought to reverse the judgment of the district court and direct it to enter judgment for the plaintiff in error association instead. Only in this way can the law deal impartially with the numerous small stockholders,

many of whom paid for their stock or a part of it by depositing out of their hard-earned savings the weekly or monthly installments on their stock. By the court's present judgment there is given to Shields and to those in like situation the preference to which *creditors* are entitled over those smaller stockholders.

Nothing has commanded more meticulous care or greater skill on the part of courts and judges than the intricate problem of properly distributing the remaining assets of insolvent building and loan associations. Insolvency of such corporations, radically different from all other classes of corporations, transforms the whole corporate structure and requires special treatment at the hands of a chancellor. Compare, for illustration, 48 Central Law Journal, pages 369-374. A judgment in favor of Shields would make him a creditor, with a preference over the small stockholders.

We may well beware, therefore, lest we visit upon the smaller stockholders a loss which, as I said in the beginning, seems a strange perversion of the idea that constitutes the foundation of building and loan associations everywhere. In my opinion the judgment of affirmance is clearly wrong.