No. 15,030.

OGDEN FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION *v.*
ARMSTRONG, TREASURER ET AL.
(141 P. [2d] 173)

Decided August 17, 1943.

Mr. CHARLES J. KELLY, Mr. STUART P. DOBBS, Mr. FRED
E. NEEF, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAW-
RENCE HINKLEY, Deputy, Mr. J. RAMSAY HARRIS, Assist-
ant, for defendants in error.

*En Banc.*

MR. JUSTICE JACKSON delivered the opinion of the
court.

THIS case originated in the district court of the City
and County of Denver, where the Ogden First Federal
Savings and Loan Association brought suit against both
the state treasurer and the commissioner of the Build-
ing and Loan Department of the State of Colorado, seek-
ing a declaratory judgment which would have the effect
of ordering those two state officials to release some
$42,000 in cash and securities belonging to plaintiff sav-
ings and loan association which the officials insist on
holding as security for Colorado investors in said asso-
ciation. From an adverse judgment in the district court,
plaintiff association brings the case here by writ of
error.

This contest arises out of the following facts: Plain-
tiff was originally incorporated in the State of Utah on
or about 1920 under the name of "Continental Building,
Loan and Investment Company," which name was
shortly thereafter duly changed by amendment of its
articles to "Continental Building and Loan Association."

Under the latter name it was duly qualified, on or about the third day of June, 1925, to transact business within the state of Colorado as a foreign building and loan association pursuant to the provisions of sections 2804 to 2807, inclusive, C.L. 1921. It continued to be so qualified until the early part of December 1930, when it ceased both soliciting and writing any further business in Colorado. In the meantime, on or about March 20, 1927, its name was again changed, by due amendment of its articles, to the "Colonial Building and Loan Association." Section 2806, C.L. '21, reads as follows: "The statements required of foreign building and loan associations shall be renewed annually in January, in the manner as required by this act, and shall be made at such other times as the secretary of state may require. When, however, the laws of any other state, territory or nation, and under which such association may be incorporated, require any taxes, fines, penalties, licenses, fees, deposits of money or securities, or other obligations or prohibitions of any associations that might be organized under the laws of this state and doing business in such other state, territory or nation, or imposes the same upon its agents doing business therein, then, so long as such laws continue in force, the same obligations and prohibitions, of whatever kind, shall be imposed upon all such foreign building and loan associations of such state, territory or nation doing business in this state, and upon their agents here, to the extent that the same may be in excess of the requirements imposed upon such foreign associations by the provisions of this act. L. '97, p. 130, §17; R.S. '08, §966."

At and during the time that plaintiff was qualified to transact business in the state of Colorado, section 1110 of title 19, chapter 10, Compiled Laws of Utah, 1919, was in effect and read as follows: "No building and loan association heretofore or hereafter organized under the laws of any other state, or territory or foreign country, for the purpose of engaging in the building and loan

business, shall be allowed to do business or sell its stock or certificates in the state of Utah without first having deposited with the state treasurer or responsible trust companies within or without the state designated by him, the sum of $50,000, either in cash or bonds of the United States, or bonds of any county or municipal corporation of the state of Utah, or in first mortgage upon real estate located within this state, as a guarantee fund for the protection and indemnity of the residents of the state of Utah with whom such association shall do business; the fund so deposited to be paid by the custodian thereof to the residents of Utah when proof of claim of final judgment has been filed with the custodian of such fund against such foreign association." Because of this paragraph of the Utah law, plus the provision of section 2806, supra, of the Colorado law, plaintiff at the time it qualified to transact business in Colorado deposited with the treasurer of the state of Colorado securities of a value of $50,000.

In 1930, as above stated, plaintiff ceased to do business in Colorado. Since then it has maintained no office or agent in Colorado. It has conducted routine correspondence and transactions with its Colorado investors, but this has involved only those who were investors prior to December 1930; and it insists that any transactions that have occurred with Colorado investors since that time have been transactions that took place in its head office in Ogden, Utah.

In 1933, some two and one-half years after plaintiff had ceased to transact business in Colorado, the Colorado legislature repealed the then existing law in Colorado relating to building and loan associations, including section 2806, supra, and enacted a more complete and detailed code relating to building and loan associations. The repealing clause contains a proviso which the Attorney General claims is a saving clause, but which plaintiff asserts is not. The new act has a provision requiring all foreign building and loan associations to deposit $50,000

in cash or certain specified securities. "Such deposit shall be held as security until all claims of residents of this State shall have been fully redeemed and paid off and its contracts and obligations to residents of this State have been fully performed and discharged." S.L. '33, c. 47, art. VI, §3 (3).

Plaintiff took no steps to qualify, nor did it qualify, to transact business in the state of Colorado under the provisions of this 1933 act. In 1935 the Utah legislature passed an act, chapter 14, S.L. '35, entitled: "An act providing for the conversion of building and loan associations and other home financing organizations into federal savings and loan associations, prescribing the procedure therefor, defining the results thereof and providing for the indebtedness of such associations." After outlining the procedure for conversion into a federal savings and loan association, section 1 of this act concludes with the following sentence: "Upon the filing of such instrument [charter issued to such association by the Federal Home Loan Bank Board] such association shall cease to be a state association and shall thereafter be a federal savings and loan association." Section 2 provides that when conversion becomes effective the association shall cease to be supervised by the state and all of its property shall be vested in the association under its new name and style and under its new jurisdiction, the final sentence reading: "It being expressly declared that the said federal savings and loan association shall be merely a continuation of the said state association under a new name and new jurisdiction and such revision of its corporate structure as may be considered necessary for its proper operation under said new jurisdiction." Plaintiff, complying with the terms of the above mentioned 1935 act of the Utah legislature, on January 21, 1937, surrendered its charter from the state of Utah and accepted a charter as a federal savings and loan association under its present name of "Ogden First Federal Savings and Loan Association."

In 1935 the Colorado legislature passed an act, S.L. '35, c. 83, similar to that of Utah, providing for the conversion of state building and loan associations into federal savings and loan associations.

In 1939 the Colorado legislature amended the building and loan association code of 1933 by enacting chapter 78, S.L. '39, which definitely exempts federal savings and loan associations from being subject to the building and loan association code of 1933.

At the present time the total liability of the Ogden First Federal Savings and Loan Association to Colorado investors is $145,997.77. This liability consists of three classes: 1. Liability on stock issued by the association since January 21, 1937, after acceptance of such federal charter, to former members who surrendered their former holdings and now actually hold stock in the new federal association—$110,196.05. 2. Liability on investment stock of the former Utah state association whose holders signed a proxy and agreement by the terms of which they consented and agreed to conversion of the company into a federal association and agreed to take corresponding value of stock in the new association. (The only step that needs to be taken in the case of these stockholders is actually to exchange their stock certificates in the old state association for the appropriate certificates in the new federal association.) The face value of these holdings is $25,995.53. 3. Investment stock of the old state association whose holders did not sign a proxy and consent agreeing to the conversion of the state association into a federal association — $9,806.19.

Plaintiff alleges, which is not denied, that every individual account with the new federal association is insured by the Federal Deposit Insurance Corporation up to the maximum amount of $5,000; that this applies to all of the Colorado investors in all three classes; that no individual account of any Colorado investor exceeds the amount of $5,000.

Plaintiff claims that under the doctrine of novation

the shareholders have surrendered any rights which they might have had under the old law existing prior to 1933, and that this doctrine of novation applies to all of the Colorado investors, even to those representing $9,806.19 who did not agree to the change-over to a federal association, by reason of the following facts. Prior to 1933 the securities of the Colorado investors in the Utah company were in the nature of either a preferred stock or a bond. "They were deprived of any share in the earnings of the association at any time they were delinquent in dues. They had no voice at all in the affairs of the association and were in many, if not all, cases mere creditors of the association. They had no share in any surplus in case of liquidation; no right to participate mutually or otherwise in its profits, receiving only a maximum stipulated earning as would any bond owner." In 1933 all of the Colorado investors exchanged their then securities for a new security in the Utah corporation. The new security consisted of stock with full voting rights entitling the holder to a share in the surplus and earnings, a share that was not subject to delinquency fines, to membership fee charges, or withdrawal fees, and granting equal participation in undivided profits and immediate rights of withdrawal. Plaintiff claims that the terms of the instrument of subscription show clearly that the new stock was not issued as a cumulative security, a renewal, or in any other relation to the old shares; that the two types of holdings were as completely different as the difference between a stock and a bond. Plaintiff cites numerous authorities on this point, in the course of which counsel state, "there are many cases upon the law of novation; comparatively few upon the effect of the issuance and exchange of new types of securities for old." All of the cases cited on this point arose in other jurisdictions, except two: *McKay v. Fleming,* 24 Colo. App. 380, 134 Pac. 159, and *Hardy v. Swigart,* 25 Colo. 136, 53 Pac. 380. Neither of these

cases involved building and loan associations or organizations similar thereto.

The distinction between a stockholder and a creditor of a building and loan association has not been clearly established, and the dividing line is much more shadowy than that existing in the field of ordinary corporations. In *Dollar Building and Loan Association v. Shields,* 93 Colo. 480, 27 P. (2d) 485, the holder of a certain certificate of deposit was held to be a creditor. In *Exchange National Bank v. Receivers of City Savings, Building. and Loan Association,* 95 Colo. 498, 37 P. (2d) 394, the holder of a certain type certificate of deposit was held to be a stockholder. Because of this highly technical nature of building and loan association securities, we do not feel sufficiently advised by the state of the record to rule that the exchange by Colorado investors of their investment stock or savings certificates, including creditor shares, which they owned prior to 1933 into the new installment stock of the company was such a difference in kind or nature of security as to constitute a novation, and it appears that no Utah cases have been cited as bearing on this point.

■■ ■■ It is apparent, however, that under the existing statutes there is no duty upon the Ogden First Federal Savings and Loan Association to maintain a deposit with the Colorado state treasurer or building and loan commissioner to protect its Colorado stockholders. Even if there had been an earlier doubt on this point, the 1939 act clearly exempts plaintiff from that section of the 1933 act relating to foreign building and loan associations. The question is then whether there is some principle of law which renders necessary the continued deposit of the securities made under section 966, R.S. '08, . supra, even though the same was repealed in 1933 and federal building and loan associations were expressly made exempt in 1939. The district court based its decision, denying plaintiff the relief prayed for, on two Colorado cases, namely: *Cochrane v. Insurance Co.,* 93

Colo. 462, 27 P. (2d) 196, and *Van Gilder v. Parker,* 69 Colo. 196, 193 Pac. 664; and the Attorney General, in support of his position, likewise relies upon these two cases and in addition quotes at length from *Relfe v. Columbia Life Ins. Co.,* 10 Mo. App. 150. It will be noted that two of these cases involve insurance companies. We find no case cited where a deposit by a building and loan association with a state official has been declared to be a trust estate held for the benefit of the members of the association. The difference between building and loan associations and insurance companies is sharply outlined by the cases in this jurisdiction which have held that a building and loan association has no power to contract with a member that his stock will mature at any definite time, as the time of the maturity of the stock depends on the success of the corporation and on contingencies which cannot be foretold. *Columbia Building and Loan Association v. Lyttle,* 16 Colo. App. 423, 66 Pac. 247; *People's Building and Loan Association v. Purdy,* 20 Colo. App. 287, 78 Pac. 465.

But this difference between the two types of companies does not alone determine this question. Other distinctions appear. In the insurance company cases above mentioned, the deposit of securities was made for the benefit of all of the policyholders, wherever they might be. In the instant case, and in other cases involving building and loan associations, the deposits of securities have been set up for the purpose of protecting the investors in the particular state whose laws require such a deposit. This is true in the instant case, where the requirement is enforced against building and loan associations incorporated in a foreign state. This supposed additional protection given local investors in a foreign building and loan association does not always work out as may have been anticipated by the law makers requiring such a deposit of securities, for it has been held, in the case of an insolvent association, that to give shareholders in one state a special security not available to

shareholders outside of this state upsets the principle of mutuality supposed to exist among all the shareholders, and that therefore the shareholders who do not share in the deposit as a special security become creditors in respect to the other assets of the building and loan association outside of the state which requires a special deposit. 12 C.J.S. 555; *Clarke v. Darr*, 168 Ind. 101, 80 N.E. 19, 9 L.R.A. (N.S.) 460. We approved the principle of mutuality among shareholders of building and loan associations when we held in *McPherson v. Railway Savings and Building Association*, 93 Colo. 155, 25 P. (2d) 388, that the controlling principle underlying a building and loan association is mutuality among its shareholders, and one shareholder cannot profit at the expense of another.

There is another even sharper cleavage between the insurance statute and the building and loan association law. It will be noted that the Colorado insurance statute not only provides that the deposit of securities shall be for the benefit of all the policyholders, but requires that the amount of the deposit shall be the cash or securities representing the minimum capital or guaranteed fund required by the act, and the concluding sentence of the section relating to the deposit expressly states that the "deposit must be an exclusive trust for the benefit and security of all the company's policyholders and creditors in the United States, * * * and such deposit shall be deemed for all purposes of the insurance laws, the capital of the company making it." S.L. 1913, c. 99, §25. We have then, under the insurance law, an express trust specifically set up for the benefit of all policyholders and, impounding the capital of the company, which in *Cochrane v. Insurance Co., supra,* we held cannot be returned to the company even when so authorized by subsequent legislation until all, who took out policies while the law providing for the deposit was in force, have had their claims satisfied in full. Under the building and loan association act involved in this

case a specific sum, $50,000, is required to be deposited in cash or securities regardless of the capital of the company or of its size in other respects. And here there is no provision that the $50,000 fund so deposited shall be treated as an exclusive trust, but the concluding sentence of the Utah statute in question makes the fund one of indemnity, namely: "the fund so deposited to be paid by the custodian thereof to the residents of Utah when proof of claim of final judgment has been filed with the custodian of such fund against such foreign association."

The greatest point of difference, however, is not between the Colorado insurance statute and the Utah building and loan association statute, but between the Colorado insurance act and that provision of the Colorado building and loan association act which brings the Utah statute into play. The insurance act has the element of completeness and finality; the building and loan association act on its face is incomplete, in that no one can tell by reading it what the obligation of any particular foreign association shall be to deposit securities until one also consults the law of the state of incorporation of such building and loan association. And even more significant is the fact that the foreign building and loan association's obligation to deposit securities in Colorado is not dependent solely upon what the legislature of Colorado has done or may do in the future, but is dependent on what the legislature of the home state of the foreign building and loan association may do in the future. Here is the acme of transitoriness.

The deposits which are the subject of this litigation were made, not solely through the operation of the law of Colorado, but because of the joint operation of the laws of both Colorado and Utah. Under the Colorado act, when Utah requires foreign building and loan associations doing business in that state to deposit $50,000, then Colorado requires Utah corporations, doing business in Colorado, to deposit $50,000. At the same time, if Wyoming requires the deposit of no securities by a Colo-

rado building and loan association doing business in Wyoming, then Colorado requires no securities to be deposited by a Wyoming corporation doing business in Colorado. But this Colorado act is not static in nature— it is fluctuating; that is implicit in the phrase: "then, *so long as such laws continue in force,* the same obligations and prohibitions, of whatever kind, shall be imposed upon all such foreign building and loan associations of such state, territory, or nation doing business in this state, * * *." (italics ours).

It is clear, therefore, that if the Wyoming legislature should subsequently require building and loan associations incorporated in foreign states doing business in Wyoming to put up a $50,000 deposit with the Wyoming state treasurer, then immediately, under the operation of this act, Wyoming building and loan associations doing business in Colorado would automatically be required to put up a $50,000 deposit with the Colorado state treasurer.

Counsel for plaintiff, because of this interaction between the laws of two states, has referred to the Colorado act as retaliatory. It is more than that. It is reciprocal, because it is both retaliatory and conciliatory. Its conciliatory side is shown where Utah, having a statute requiring a $50,000 deposit by foreign associations doing business in that state, should later repeal that statute and allow foreign associations to do business in Utah without putting up a $50,000 deposit of cash or securities. Colorado would then have to allow Utah associations to do business in Colorado without putting up a $50,000 deposit of cash or securities; and, to comply with the provisions of the act, it is our opinion that any deposits then in the hands of the Colorado state treasurer belonging to a Utah building and loan association, not at the time reached by a suit, judgment or lien of a Colorado investor or creditor, would have to be returned to such association. The deposit of securities under this statute was not the principal thing but was

merely incidental to the business of getting favorable treatment for Colorado associations in foreign jurisdictions. The very provision relating to the deposit of moneys or securities is not given the importance of a separate paragraph, or even of a separate sentence, but is lumped in one category along with taxes, fines, penalties, license fees, and other obligations or prohibitions which were all to be asserted or abated in accordance with the law of each particular foreign state.

■ It is our opinion, therefore, that section 17, chapter 33, S.L. 1897, being section 966, R.S. '08 and section 2806 C.L. '21, not only did not set up an express trust for the benefit of resident investors in foreign building and loan associations, but on its face showed that the act was a trading statute and that the legislature intended that no vested interest should be acquired under it in the sense that a vested interest has been awarded in the Cochrane and Van Gilder cases, supra.

We conclude that, because of the differences existing between the Colorado insurance act on the one hand and the pertinent Colorado and Utah building and loan association acts on the other—these differences relating to: 1. Subject matter; 2. Type of deposit required; and 3. Purpose and nature of the acts—the doctrine of the Cochrane and Van Gilder cases is not applicable to the instant case. The judgment is accordingly reversed.