## RADALJ v. UNION SAVINGS & LOAN ASS'N.

(No. 2234, June 22, 1943; 138 Pac. (2d) 984)

142

For appellant, there was a brief by *C. R. Ellery* and *A. G. McClintock,* of Cheyenne, and *Edwin V. Magagna,* of Rock Springs, and oral arguments by *Messrs. Ellery* and *Magagna.*

For the respondent, there was a brief by *George W. Bird* and *Mahlon E. Wilson,* of Salt Lake City, Utah, and oral argument by *Mr. Wilson.*

150

BLUME, Justice.

This action is brought by Anthony J. Radalj, known as Tony Radalj, against the Union Savings and Loan Association, a corporation, to recover judgment on two savings certificates. In the first cause of action the plaintiff seeks to recover judgment on a certificate reading on the outside as follows: "6% Class F Savings Certificate No. 181, Union Savings and Loan Association, Rock Springs, Wyoming. Capital Fully Paid $100,000.00. In account with Tony Radalj, Rock Springs." The inside of the certificate reads as follows:

"This certifies that Tony E. (J.?) Radalj, Rock Springs, is the owner of Class F Savings Pass Book No. 181 of the Union Savings and Loan Association of Rock Springs, Wyoming, upon which deposits of $10.00 or multiple of same may be made at any time for any amount.

"The permanent Reserve Fund Capital Stock of the Union Savings and Loan Association, guarantees the holder against loss from any cause of the amount, or any part thereof that may be deposited thereon, and also guarantees that interest paid shall be at the rate of Six per cent per annum compounded semi-annually (figured on declining balances when funds are withdrawn between interest periods.) No interest paid for fractional part of a month. The amount deposited, together with interest thereon to the last preceeding interest period may be withdrawn in full or in part upon written notice being filed with the secretary as follows: If the amount is $1000.00 or under thirty days' notice. If the amount is over $1000.00 and under $2000.00, sixty days' notice. If the amount is over

$2000.00, ninety days' notice, provided that not more than one-half of the funds in the Treasury of the Association shall be applicable to the demands of withdrawing certificate holders without the consent of the Board of Directors.

"Dated at Rock Springs, Wyoming, this 8 day of January, 1930."

The book shows payments as of January 3, 1934, including credits for interest the sum of $12,308.41. In the second cause of action the plaintiff seeks to recover judgment on a similar certificate reading on the outside like certificate No. 181, except that 5% is substituted for 6% and the number 303 is substituted for 181, and reading on the inside as follows:

"This is to certify that Tony C. (J.?) Radalj, Rock Springs, is the owner of Class F Savings Certificate No. 303 of the Union Savings and Loan Association of Rock Springs, Wyoming, upon which deposits of $10.00 or multiples of same may be made at any time and in any amount.

"Interest shall be paid at the rate of five per cent per annum, compounded semi-annually; provided that no interest shall be paid for a fractional part of a month, and providing that when funds are withdrawn between interest paying dates, interest shall only be computed on the lowest balance in the account as of such semi-annual interest paying date.

"The sum deposited, together with interest earned may be withdrawn in full or in part on any interest paying date upon written notice being filed with the Secretary as follows: If the amount is $1,000.00 or under, thirty days' notice. If the amount is over $1,000.00 and under $2,000.00, sixty days' notice. If the amount is over $2,000.00, ninety days' notice, provided that not more than one-half of the funds in the Treasury of the Association shall be applicable to the demands of withdrawing certificate holders without the consent of the Board of Directors.

"Dated at Rock Springs, Wyoming, this 20 day of Jan. 1932."

The foregoing is followed by stating:

"A Receipt Book is issued to each member in which are recorded credits, withdrawals, and dividends and is issued and made subject to the By-Laws of the Association.

"Investments in this Association are secured in the following ways: By First Mortgages on Improved Real Estate pledged to the Association. By our Guarantee Capital Stock. By our Reserve Fund Account. By State Supervision, Inspection and Control.

"Interest or Dividends on this account will be credited on January and July 1st of each year."

The book shows the balance due the plaintiff as of January 1, 1934 in the sum of $10,143.37. Plaintiff alleged that these sums were loaned to the defendant; that on June 4, 1938 he demanded payment of these certificates together with interest thereon but that defendant has ignored the notice and has failed to pay. The defendant in its answer admitted the issuance of the certificates sued on, and that notice of withdrawal of the amounts shown thereby was served on the defendant. It was further alleged, in brief, that defendant did not borrow money from the plaintiff, but that plaintiff, on the contrary, became a member of the association; that following the economic crash of 1929, the defendant became insolvent, and was insolvent commencing with November 1934 and was so at the time when the plaintiff asked to withdraw his money; that the State Examiner did not take charge of the defendant for fear that this would have a tendency to increase the apprehension of the members of other building and loan associations; that, accordingly, about November 1934, 92% of the members of the association determined that the defendant should go into voluntary liquidation; that this was done, and distribution of 64% of the amounts due have been paid to members agreeing thereto, and that it is hoped that the ultimate payment may amount to 85% of the amounts due. The plaintiff

in reply denied, in brief, that he became a member of the defendant association, but alleged that he was a creditor thereof.

The record shows the following facts: The defendant corporation was organized in November 1922 with a capital stock of $100,000 divided into Expense Guarantee Stock of $10,000 (100 shares of the par value of $100. each), and $90,000 Permanent Reserve Guarantee Stock (900 shares of $100. each), which latter stock had no rights of withdrawal, except on dissolution of the corporation, and was issued "to guarantee all stocks, bonds, securities and creditors against any loss arising from investments and other losses incurred in conducting business." On June 5, 1930, the Expense Guarantee Stock was eliminated, and all the stock was made Permanent Reserve Guarantee Stock. The purpose for which the corporation was organized, as stated in the articles of incorporation, will be mentioned hereafter. It seems that in the beginning and probably for some years thereafter, the corporation issued only so-called Installment Savings Certificates. We herewith set out a sample thereof, which appears in the records of this case:

"Maturity value $10,000.00. Monthly installment $55.00. Union Savings and Loan Association, Rock Springs, Wyoming. Capital stock $100,000.00, fully paid.

"This is to Certify that Tony C. (J.?) Radalj of Rock Springs, Wyoming is the record owner of the above numbered installment savings certificate issued by the Union Savings and Loan Association of Rock Springs, Wyoming, of the value, when matured, of Ten Thousand and no/100 dollars that in consideration of the payment by the said Tony C. Radalj his heirs or assigns to the Union Savings and Loan Association at its office in Rock Springs, Wyoming, of $55.00 per month in advance commencing with the month of Feb. 1923 for one hundred and twenty six months from date hereof, the Union Savings and Loan Association prom-

ises to pay to the said Tony C. Radalj or the recorded owner hereof, at the expiration of said period, upon presentation and surrender of this certificate, properly endorsed, to the Union Savings and Loan Association at its general office in Rock Springs, Wyoming, ten thousand and no/100 dollars legal tender money of the United States of America.

"This certificate is issued and accepted subject to the provisions of the Articles of Incorporation and the By-Laws of the Association and the privileges, terms and conditions printed on the back thereof, all of which are made a part hereof, as fully as if set forth on the face of this certificate.

"In witness whereof, the Union Savings and Loan Association has caused this certificate to be executed in its corporate name and its corporate seal to be affixed hereto at Rock Springs, Wyoming, this 19th day of March, 1923."

Late in 1934 or early in 1935, the association found itself in financial difficulties and determined to borrow money from the Reconstruction Finance Corporation. Evidently at the request of that company the capital stock of the defendant association was reduced to 1000 shares of the par value of $1.00 each, and the investors of the defendant association were requested to waive 30% of the amounts which were due them in order that a loan might be made to the association. A so-called reorganization agreement was drawn up, reciting in part as follows:

"Whereas on account of economic conditions prevailing for the past several years throughout the United States, and particularly throughout that part of the United States in which the Association functions and operates, the Association now finds itself in a position in which it is unable to make payment on withdrawal requests, matured certificates and other obligations owing to its investors," etc.

The agreement was to be signed by the stockholders and the owners and holders of the various types of investment or savings certificates or savings pass

books, and to waive 30% of the book value of their investments as of January 31, 1934. 92% of these investors signed the agreement, and to them was issued a fully paid investment certificate, evidently representing 70% of their investments as of January 1, 1934, and a so-called recovery certificate, under which, in brief, additional amounts were to be paid if more than 70% of the investments should ultimately be recovered. Thereafter the Reconstruction Finance Corporation loaned to the defendant the sum of $800,000. $50,000. of this amount was kept on deposit by the association in various banks to protect itself as to the investors who had not agreed to the so-called reorganization, and apparently the sum of $750,000. was distributed to the 92% of the investors who agreed to this reorganization, and the total amount paid them to the date of the trial is approximately 64% of their investments. At that time, the amount due on certificates issued by the association was $1,013,251.29. It owned real estate valued at $436,106.47, which evidently had been taken over on foreclosures. Property resold on contract amounted to $44,664.10; mortgages owned amounted to $559,525., but some of these were slow and foreclosure on them was about to be commenced. The trial court found in favor of the plaintiff and his theory, and proposed to enter judgment on the first cause of action for $12,308.41 and interest in the sum of $7,251.20, and judgment on the second cause of action for the principal sum of $10,143.37 and interest from January 1, 1934 in the sum of $4,792.09. Prior to the entry of the judgment, the defendant paid to the clerk of court in partial satisfaction of the indebtedness claimed by plaintiff in the first cause of action the sum of $7,877.38, and in partial satisfaction of the indebtedness claimed in the second cause of action the sum of $6,491.75. These sums were 64% of the amount due plaintiff as of January 1, 1934. They were deducted

from the amount for which the court intended to enter judgment, and a judgment was accordingly entered for the remainder. From that judgment the defendant has appealed to this court. Other facts will be stated hereafter.

I. Counsel for plaintiff contend that the assignments of error are insufficient to permit this court to permit this court to review the case. Assignments of error numbered 6 and 7 are "that the judgment of said district court is contrary to and not sustained by the evidence," and "that the judgment of said district court is contrary to law." These assignments of error are sufficient for a review of the case by this court. Schiller vs. Blyth Fargo Company, 15 Wyoming 304; 88 Pac. 648; Wolbol vs. Steinhoff, 25 Wyoming 227; 168 Pac. 251.

II. It is contended by counsel for the plaintiff herein, that in view of the fact that the defendant deposited sums of money in the office of the clerk of court in partial satisfaction of the indebtedness claimed by the plaintiff, defendant is now bound by the judgment entered by the court herein, and counsel cite us, for instance, to 21 Enc. Pl. & Pr. page 582, where it is stated that "where the declaration contains only one cause of action specifically set forth, a plea of tender by the defendant operates as a conclusive admission of every fact which the plaintiff would be bound to prove in order to maintain his action; but when the declaration is general, such a plea admits only some contract or liability of the kind alleged." It is argued that the plaintiff pleaded that he loaned the money to the defendant; that the defendant pleaded that plaintiff was a member of the defendant association; that, accordingly, "these payments were a conclusive confession and admission of the relation of debtor and creditor relied upon by the plaintiffs to justify recovery, and

under such circumstances it is not believed that this court has anything to review." Section 89-1225 Rev. St. 1931 provides that an offer to confess judgment "shall not be deemed an admission of the cause of action, nor of the amount to which the plaintiff is entitled." That is a broad provision, and to hold with the contention of plaintiff as made herein would seem to be in direct conflict with the spirit of the statutory provision just quoted. In Sanborn vs. Dentler, 97 Wash. 149, it is held that a tender or a deposit in court admits that the plaintiff is entitled to recover in some sum, but "it does not admit that the contract is as alleged by the plaintiff, or that the basic measure of recovery is as alleged." In Young vs. Borzone, 26 Wash. 4; 66 Pac. 135, 421, 423, the court stated that a tender "goes only to the extent of admitting that a contract of the general nature pleaded was entered into, not that the plaintiff has correctly pleaded the contract." In Simpson vs. Carson (Ore.) 8 Pac. 325, the court stated that "the tenders and payment into court only admitted the cause of action as to the sum tendered. It did not conclude the respondent as to any defense she might have against a further recovery." In Annotation 21 L. R. A. (N. S.) 354, it is stated that "when the action is based upon a contract some cases hold, either expressly or by implication that the tender admits a liability to the amount of the tender only, and beyond that the defendant may avail himself of any defects to defeat a further recovery." See also Union Marine Ins. Co. vs. Charles D. Stone & Co., 15 Fed. (2d) 937 and 26 R. C. L. 650. Counsel cites several cases, as Uedelhofen vs. Mason, 201 Ill. 465, 66 N. E. 364 and Newman vs. Levi, 74 W. Va. 223, 81 S. E. 1038, in which it is said that when a tender or payment in court is made that constitutes an admission of every fact which the creditor would be required to prove to entitle him to a judgment for the amount tendered or

paid into court. We think that counsel have misunderstood this holding. It would not have been necessary in this case, in order to recover a judgment for the amount paid into court, to prove the relation of debtor and creditor; judgment for that amount could have been recovered by merely showing that the plaintiff held the certificates sued on, and whether he was a creditor or whether he was a member of the defendant association, would have made no difference. Plaintiff's contention is substantially to the effect that his theory as to the meaning and effect of the contract, or the conclusions drawn by plaintiff in his petition as to such meaning and effect, are also admitted by the payment into court. We find no justification for such contention in the authorities, and it must, accordingly, be overruled.

III. Before proceeding further, it may be well to state our conclusions on some preliminary matters.

(a) The defendant association ceased to do any business, except in liquidation, in 1935. The reorganization agreement recites that it was insolvent. It borrowed $800,000. from the Reconstruction Finance Corporation for the purpose of liquidation. Nevertheless, the 92% of those who agreed to the so-called reorganization have been able to be paid only 64% of the amount due them. The association took over a large amount of land, and some of the mortgages on hand at the time of the trial were about to be foreclosed. We think we are warranted in inferring from these and other facts that the defendant association was insolvent at the time when the plaintiff gave the defendant notice to the effect that he wished to withdraw his money.

(b) The certificates sued on herein provide that $10. or any multiple thereof might be deposited at any time; that withdrawals might be made, but "that not more than one-half of the funds in the treasury of the

association shall be applicable to the demand of withdrawing certificate holders without the consent of the Board of Directors." And, one of the certificates states that "a receipt book is issued to each *member*." These are earmarks—possibly of deposits in a savings bank, but more probably, of membership in a building and loan association, and since plaintiff knew that the defendant association was not a savings bank, the earmarks are, as to him, those of membership in a building and loan association. Nevertheless, it may be admitted that the certificate might be construed as creating the relation of debtor and creditor, as opposed to membership, in the association. Appeal of Criswell, 100 Pa. St. 488; Gromann vs. Brown, 68 Mo. App. 630; Dollar Bldg. & Loan Ass'n. vs. Shields, 93 Colo. 480; 27 Pac. (2d) 485; Western Bond & Mortgage Co. vs. Crews, 112 Ore. 663; 231 Pac. 138; Watson vs. Stockton Morris Plan Co., 34 Cal. App. (2d) 393; 93 Pac. (2d) 855; In Re Nat'l. Bldg. Loan & Provident Ass'n., 12 Del. ch. 93; 107 Atl. 453; Guild vs. Baker, 69 N. J. Eq. 61. Contra, e. g.: Moore vs. Conover, 123 N. J. Eq. 61; 195 Atl. 833. However, we must construe the certificates in suit in the light of the facts in the case. The by-laws of the corporation authorized the issuance of installment savings certificates and paid-up certificates. The testimony speaks only of *certificates* as though they were all similar in kind. The so-called reorganization agreement required the signatures of all types of investment certificates or savings certificates or savings pass books, as though all investors had similar certificates, and 92% of these investors signed the agreement. Judging from the numbers which the certificates in evidence bear, 2,785 installment savings certificates had been issued on March 8, 1932, and 303 paid-up savings certificates. Taking all these facts into consideration, while the record might be clearer on the point, the only reasonable inference we can draw, in the

absence of any showing to the contrary, is that the investors had all similar certificates, either installment savings certificates, or paid-up savings certificates similar to those issued to plaintiff. If the certificates sued on herein created the relation of debtor and creditor, rather than membership in the association, the installment savings certificates, and probably all others, must be considered in the same light. Counsel for plaintiff seem to concur in that, for they say, among other things, that the defendant was "an investment company and a loan company." In fact, installment savings certificates like those in evidence here (and probably serving as a model therefor) were held to create the relation of debtor and creditor in Intermountain Bldg. and Loan Ass'n. vs. Gallegos, 78 Fed. (2d) 972. See also In Re Western States Bldg. and Loan Ass'n., 50 Fed. (2d) 632. We are accordingly compelled to hold all the certificate-holders to be nothing but creditors, in the sense stated, or all to be members of the defendant association. In order to determine the point a critical examination of our statutes, the parallel of which we have not found in any other state, will be necessary. This, we regret, has not been done by counsel. The form of these certificates is not controlling. The facts and the statutes applicable determine their status. Moore vs. Conover, 123 N. J. Eq. 61; 195 Atl. 833; Martin vs. Bldg. and Loan Ass'n. (Cal.) 116 Pac. (2d) 71, and authorities cited. Fletcher, Cyc. Corporations (Permanent Edition) Vol. 13, sec. 5755, Vol. 11, sec. 5294. That the term "interest" is used in the certificates instead of "dividend" is not conclusive. Fletcher, supra, sec. 5294. In Re Pacific Coast Bldg. and Loan Ass'n., 15 Cal. (2d) 134; 99 Pac. (2d) 251, "share-holders" were held to be creditors along with savings certificate-holders. In Towles vs. South Carolina Produce Ass'n., 187 S. C. 290; 197 S. E. 305, the court stated that "in fact a stockholder is a creditor."

In Rummens vs. Savings and Loan Ass'n., 182 Wash. 539; 47 Pac. (2d) 845, all investors, though called share-holders, were held to be "depositors," that is to say, creditors of the association, as generally considered, but subject, nevertheless, to the fundamental law of mutuality and equality applicable to building and loan associations. In Washington, building and loan associations are generally referred to as savings and loan associations. We may be permitted, for the purpose of analogy, to refer to the relationship created by a bank, particularly a savings bank, and its depositors, inasmuch as the purpose of savings banks is similar to that of a building and loan association. In 7 C. J. 863, it is said that "it has also been considered that the relation of the depositor to the bank is analagous to that of stockholders in banks of discount, or even in business associations." See also 9 C. J. S. 1415. In 4 Cal. Jur. 190, sec. 83, it is stated that "according to the original conception of a savings bank, organized without capital stock, the depositors were members of the corporation and shared proportionately in the profits and losses, and the managers of the funds were but the trustees and agents of the members. In such a savings institution, the ordinary relation of debtor and creditor did not exist, but the money was held in trust for the depositors who were cestui que trust." In Hannon vs. Williams, 34 N. J. Eq. 255, the court states among other things:

"The assets of a bank are its invested funds, the common contributions of all the depositors, in which they have a common interest. All the profits of the business are divided among the depositors or accumulated in a surplus fund for their joint benefit and greater security. As each depositor is entitled to his proportionate share of the profits, so in equity, each should bear his proportionate share of the losses. * * * * In a savings bank, the depositors bear, in greater degree, the same relation to each other and to the prop-

erty of the bank as do the stockholders in other monetary institutions. To the corporation itself they occupy the double relation of stockholders and creditors. In prosperity they are the stockholders among whom the profits are divided. In case of insolvency, they are the creditors, and usually the only creditors, among whom the remaining assets are to be distributed."

In Alexiou vs. Savings Bank, 110 Conn. 397; 148 Atl. 374, the court stated:

"Savings banks in this state are incorporated agencies, without capital stock, for receiving and loaning the money of depositors and the assets of the corporation belong to all the depositors in proportion to their deposits. While the bank thus becomes in a sense, the debtor of the depositor, it is also his agent, since the depositor retains the equitable ownership of the deposit while transferring the legal title to the bank for the purpose of investing and conserving it for him."

Reference is at present made to these citations in the main to show that there is no hard and fast formula for the determination of the exact relationship created between the plaintiff and the defendant, and that relationship and the rights and duties created thereby, must be determined by considering all the facts in the case and the statutes applicable thereto.

IV. As already indicated, counsel for the plaintiff contend that the defendant association is not a building and loan association, and that the relationship created between the plaintiff and the defendant, by reason of the certificates sued on herein was that of debtor and creditor rather than that of membership. They further contend that even though defendant is a building and loan association, that fact does not make any difference in this case, and that it is immaterial whether the defendant association is governed by articles 1, 2, or 3 of chapter 17 of the Rev. St. 1931, hereinafter mentioned. Counsel for the defendant contend that the defendant was and is a building and loan association;

that as such, it had no power to borrow or obtain money, except from its members, and that hence the relationship created by the certificates was that of membership of the plaintiff in the defendant association. We have three different statutes governing building and loan associations, all now contained in chapter 17 of the Rev. St. 1931, namely that in article 1 thereof (sections 17-101 to 128), article 2 thereof (sections 17-201 to 210), and article 3 thereof (sections 17-301 to 317). These statutes were passed in 1897, 1923, and 1927, in reverse order. Article 3 (the law of 1897) applies to associations under the so-called serial plan, under which shares are issued by definite series, issued at intervals. It is not claimed, and it is unlikely that this article applies to the defendant association. Counsel for the defendant, however, claim, that the defendant comes under the provisions of article 2, and if not, under the provisions of article 1 above mentioned. Article 2 applies to building and loan associations under the so-called permanent plan, under which a person may become a member of the association at any time, and each member's share is treated, as it were, as a separate series. Sundheim, Building and Loan Associations (3rd ed.) section 13. Section 17-201, Rev. St. 1931, provides that "permanent plan building and loan associations, organized for the purpose of raising funds by collection of dues or stated payments from its members, to be loaned among its members, may be incorporated," etc. Section 17-202 provides for the issuance of stock including a guarantee stock which shall guarantee the safety of all other classes of stock. Section 17-203 provides that such association shall have the powers provided for in the general laws of this State relating to the creation and regulation of private corporations, and in addition the powers provided in article 2, supra; to issue stocks to its members, etc. The article further provides for the making of

by-laws, for withdrawals, and for making loans. Section 17-210 provides that "any association heretofore incorporated under the laws of the State of Wyoming whose articles of incorporation are in substantial compliance with this act shall be entitled to the benefits and subject to the provisions thereof without re-incorporation or may amend its articles to conform to the provisions of this article." The defendant did not amend its articles of incorporation to comply with article 2. But counsel for defendant contend that, nevertheless, it comes within the provisions of this article. It may be noted that the criterion as to whether it does or not depends upon the *articles of incorporation*. In this connection one of the main features to be examined is the purpose, or object for which the corporation was organized. The articles of incorporation of defendant provide:

"That the object for which our said corporation is formed is as follows:

"First: To provide a loan and investment fund by sale of stocks, bonds, certificates and other securities, the same to be sold on payments either in lump sum or installments; to make loans to its members on a plan for repayment of principal and payment of interest in monthly payments, or at other determined periods of time; to borrow and receive money for loan purposes and to handle and loan the moneys of others as agent, for commission; to own, buy, sell or otherwise dispose of, and mortgage, pledge or otherwise encumber, and generally to deal in and handle contracts, stocks, bonds, mortgages and other securities; to finance the construction of buildings on real estate owned by the association or its members, or otherwise; to buy, sell, rent, encumber and otherwise contract with reference to handling and realizing upon securities held by it which might be done by a private person; to handle as agent at and for a commission the property of others and to collect rentals therefor and other income therefrom; to give evidences of indebtedness created by it in the form of notes, bonds or other securities, secured by mort-

gage, pledge, or other encumbrance of property of the company, or unsecured, and to collect dues, fines, fees and other stated payments from its members; and generally to do all and anything necessary or incidental to the above-enumerated powers or to the business of conducting a Building and Loan Association and to have any and all other powers given by the laws of the State of Wyoming, now in force, or hereafter enacted, to corporations, and particularly to corporations engaged in the Building and Loan business."

It may be doubted that articles of incorporation which disclose as many purposes of organization as those of the defendant may be said to be in substantial compliance with article 2 under discussion. Section 6 of article 10 of our Constitution provides that "no corporation shall have power to engage in more than one general line or department of business, which line of business shall be distinctly specified in its charter of incorporation." It can scarcely be doubted that the business of a building and loan association has long been, and is now, recognized as a distinct and separate line or department of business. Hence the power given in section 17-203 "relating to the *creation* and *regulation* of private corporations" should probably be construed as not embracing the object or purpose for which the corporation is organized. Further, sections 17-202 and 203 doubtless contemplate the issuance of stock to the various investors in the corporation. The articles of incorporation of the defendant do not permit that. The capital stock is confined to $100,000. The articles of incorporation provide that the corporation shall have power to "finance the construction of buildings on real estate owned by the association or its members or otherwise." That evidently means that it may make loans of money to any party whatever for the purpose of such construction. But section 17-207 of article 2 provides that "loans shall be made to members only," and hence the provision mentioned is in direct

conflict therewith. Furthermore, article 2 applies to building and loan associations to conduct business on the so-called "permanent plan." The statute does not define the term, but doubtless refers to the plan as generally understood. We look in vain in the articles of incorporation of the defendant that the purpose of the defendant is to do business as a building and loan company on the *permanent plan*. So far as the articles of incorporation are concerned, the company could do business on the serial or any other plan. And, in view of its guarantee capital stock, and the control of the company which is given to the holders thereof, it would appear, so far as its articles of incorporation are concerned, to be a building and loan association on the "Guarantee Capital Stock Plan" mentioned in Sundheim, supra, sec. 17, rather than any other. We think, accordingly, that the defendant association cannot be held to come within the terms of article 2, supra.

V. We must, accordingly, turn to article 1, supra. That law was passed in 1927, and the bill as introduced in the House was intended to supersede all other laws relating to building and loan associations. It was amended, however, in the House and in the Senate, so that, under section 17-128, the law does not apply to a corporation theretofore organized under article 3, supra, nor does it apply "to any corporation heretofore organized and existing under and by virtue of, or coming within the provisions contained in article 2 hereof." We have seen that the defendant association was neither organized under nor does it come within the provisions of either of these articles, so that this section of the law has no application herein. Article 1 was evidently intended to make radical changes in connection with building and loan associations and bring them under greater public control. It is not necessary to refer to all the provisions of the law. Most of them are the usual provisions found in statutes relating to

such associations. Section 17-106 provides that "the membership of any association coming under the provisions of this article shall consist of those persons holding shares therein." The capital stock, according to section 17-107 shall consist of the accumulated payments made by its members and dividends created thereon, and shall be represented by shares. No shares shall be issued, *which shall be exempt from bearing their pro rata portion of loss*. The association may issue installment shares, savings shares, prepaid shares and fully paid shares, and may do business under the serial or the permanent plan. Guarantee reserve stock theretofore issued may be retained. It is entitled to share in all earnings equitably, and may receive additional dividends in consideration of the guarantee of the safety of all other shares. Other earnings are, according to section 17-108 distributed ratably. The control of the association is apparently vested in all the shareholders, the power being given them to amend the articles of association. Section 17-102. According to section 17-109, such association may borrow money from another association under certain conditions and by issuing its debenture bonds. According to section 17-115 "the board of directors of any association may retire all classes of free shares by enforcing withdrawals of the same." The statute does not define "free shares," but probably meant shares with no incumbrance thereon, possibly excluding installment shares not yet matured. Not more than 50% of the receipts of the association in any one month shall be applied to the payment of withdrawals; but under certain conditions, the board may pay withdrawals ratably and upon a proportionate basis, and the State Examiner may direct that to be done. Section 17-101 provides as follows:

"Any association which shall be organized within this State for the purpose of accumulating funds from

its members, share holders, or savings certificate holders, to be loaned to its members, or others, and any association, company, corporation, or syndicate that sells savings certificates payable by installment, shall, for the purposes of this article, be known and considered as domestic building and loan associations; provided, that this article shall not apply to associations, or corporations legally engaged in the business of banking within this State."

It can scarcely be doubted that the legislature, by the provisions of this section, intended that associations such as the defendant should be considered a building and loan association. To make that doubly certain, it provided by sdection 17-119 as follows:

"The power, rights, duties, privileges and obligations of every association heretofore or hereafter organized and doing business in the form or of a character similar to that authorized by this article, shall be governed, controlled, construed, extended, limited and determined by the provisions of this article, to the same extent and effect as if said association had been organized and incorporated under or pursuant to the provisions of this article, and the Articles of Incorporation, by-laws and rules of every such association heretofore made or existing are hereby modified, altered and amended to conform with the provisions of this article and the same are declared void where such Articles of Incorporation, by-laws or rules are inconsistent with the provisions of this article; except that the obligations of any existing association, whether between such association and its shareholders or any one of them or any other person or persons or any valid contract between the shareholders of such association existing at the time this article takes effect shall not be in any way impaired by the provisions of this article; and with such exceptions every building and loan association shall possess the powers, rights, duties and privileges, and be subject to the obligations, restrictions and liabilities conferred and imposed by this article, notwithstanding anything to the contrary in its Articles of Incorporation, by-laws or rules. All obligations to any such association heretofore contracted shall be enforce-

able by it and in its name, and demands, claims and rights of action against any such association may be enforced against it as fully and completely as they might have been enforced before."

The section is broad and sweeping. Its validity is not questioned. See Moore vs. Conover, 123 N. J. Eq. 61, 83-85; 195 Atl. 833. Its meaning can hardly be misunderstood. Not only was the defendant association organized, as stated in its articles of incorporation, to do business as a building and loan association, partly at least—a hybrid organization though it was—but it issued installment and other savings certificates as provided by section 17-101, supra. It would, accordingly seem to be clear that it "was doing business in the form and of a character similar to that authorized by this article," as stated in the section of the statute last quoted. Hence, we are unable to see how it is possible to escape the conclusion that the defendant association became a building and loan association, if it was not one previously, when the legislative act of 1927 (c. 103 Sess. L. 1927) went into effect on June 30 of that year. To hold the contrary would seem to fly directly in the face of a statute which apparently was intended to make some radical changes in the law governing building and loan associations and which meant to bring within its scope all organizations similar to that provided for in the statute, except as expressly excepted. And in view of the fact that in the course of legislation exceptions were made as already stated, the section last quoted apparently was particularly intended to bring within the scope of the law hybrid organizations such as the defendant. If that were not so, the section would seem to have little or no effect, but we are not authorized to eliminate it from the statute. Obviously, then, the original articles of incorporation of the defendant, upon which counsel for plaintiff rely so much to sustain their theory, have,

under article 1, supra, no bearing herein. These articles of incorporation were modified by the statute and abrogated in so far as inconsistent with it. By an unusual and drastic provision, the like of which we have not found to exist in any other state, the statute itself substantially fixed the contents of the articles of incorporation of the defendant, and, hence, the argument and the cases cited in support, that the validity of the articles of incorporation is not subject to collateral attack, can have no application in this case.

There was, of course, a purpose in the statute in providing that an association which issues savings certificates shall be a building and loan association, and that is, that it shall be governed by the provisions made by the statute for such associations. Generally recognized as one of the fundamental principles governing such associations is that of mutuality and equality. Endlich, Building and Loan Associations (2d ed.) sec. 16. In this case, the defendant association issued, as already stated, nothing but savings certificates or the equivalent thereof (aside from the guarantee reserve stock for which special provisions are made by the statute). If, as contended, these savings certificates created the relation of debtor and creditor, we can conceive of no provision of the statute which would be applicable to the defendant association, and that would seem to mean a direct contradiction in terms. Take, for instance, the retirement of free shares, already mentioned, which, according to the statute, may be enforced by the board of directors. Since in this case, the investments consisted only of savings certificates, that provision would be inapplicable, if plaintiff's theory is correct. Again, the statutory limiting provision (sec. 17-109) that a building and loan association may borrow money from another like association upon its debenture bonds would be meaningless, so far as defendant is concerned, if the contentions of plaintiff were to be sustained. Here is a

specific enumeration from whom and the manner in which an association may borrow money. In fact, the section purports to cover the whole subject relating to the borrowing of money. These provisions exclude the power to borrow from anyone else or in any other manner. Moore vs. Conover, supra. It is stated in Fletcher, supra, vol. 7 sec. 3648 as follows:

"It is a general rule that when the charter of a corporation enumerates certain powers as thereby conferred upon the corporation, it is to be construed as excluding or withholding all other powers than those enumerated and such incidental powers as are reasonably necessary to the proper exercise thereof. This rule is expressed by the maxim, expressio unius est exclusio alterius. * * * If a particular power is omitted from those enumerated in the charter, it is to be taken as a prohibition against its exercise, unless it is an imperative implication of its inclusion. * * * If the powers are expressly enumerated in detail such specification by implication excludes all other powers or rights, except such incidental or subordinate rights and powers as may be necessary to an exercise of the powers and rights expressly given."

The association was enabled to increase its capital, if it desired, by issuing fully paid shares, authorized by the statute. This authority was "not to afford such an association a devious method of obtaining a loan" (State ex rel vs. Am. Bldg. and Loan Ass'n., 177 Tenn. 385, 397), but to obviate the necessity of borrowing, and this proviison emphasizes the exclusive provision for the right to borrow.

In the case of White vs. Wogaman, 47 Ariz. 195; 54 Pac. (2d) 793, the court considered the laws relating to building and loan associations. The statute provided, similar to section 17-101 of our statute, that they might obtain money from its members. It contained no provision that it could *borrow* money. The court held that borrowing money from outsiders was illegal, and that the creditors must share losses equally with the

members of the association. Our statute is more specific. It provides from whom it may borrow money, excluding the right to borrow from anyone else, and the basis for holding that the plaintiff must share losses equally with others is much stronger than it was in the Arizona case. Nor is it necessary herein, in order to arrive at the final result of the Arizona case, to follow the same line of reasoning or to hold that an actual lender of money cannot recover it. See Fletcher, supra, vol. 6 sec. 2618, vol. 7 sec. 3488; Lander State Bank vs. Putnam, 40 Wyo. 312; 276 Pac. 926. In this case it is only necessary to say, that in view of the limitation of the power to borrow money, in the strict sense of that term, and in view of the fact that an association which issues savings certificates is, under the statute, a building and loan association, a strong implication arises that all holders of savings certificates are, by the statute considered, members of the association, and as such must, accordingly, share all losses according to the express provisions of section 17-107. That seems to be substantially the position taken in Teller vs. Wilcoxen, 110 Iowa 565; 81 N. W. 772, and see Moore vs. Conover, supra.

Counsel argue at length that a building and loan association has implied power to borrow money. The authorities on the subject are not in harmony. See Sundheim, supra, sec. 182; Sundt vs. Mutual Bldg. and Loan Ass'n., 37 N. M. 1; 16 Pac. (2d) 394, and annotation to that case in 87 A. L. R. 1156. No case has been pointed out to us which was decided under a statute like ours, under which, as already shown, the right to borrow money from anyone, except the party specified in the statute, is excluded. The case nearest alike to this is Moore vs. Conover, supra. Sundheim, supra, section 44, states that "if an association received such deposits without authority, it would no doubt, be considered as borrowed money, and the depositors

would be creditors of the association." Counsel for plaintiff have cited us to this holding, and at first blush it might seem as sustaining their contention. But the contrary is true. In section 181 the author states:

"Borrowed money, in a building and loan association, may be said to include all money obligations of the association, except obligations to members on their stock subscriptions, balances due members on their loans, current expense bills such as salaries, rent, printing, etc., *and in those jurisdictions where it is authorized by statute, the money due depositors may also be excepted.*" (Italics supplied.)

The author, then, takes the position that when the statute authorizes the taking of deposits, the depositors are not creditors—in other words they are in the same position as members. Section 17-112 of our statute, hereinafter more fully mentioned, authorizes the receipt of deposits at least impliedly. In other words, the author's view appears to be that if the taking of deposits is part of the authorized, regular, ordinary business of a building and loan association, the depositors are not creditors, but are in the position of members. His view, then, appears to be in complete harmony with the conclusion herein reached by us. If the words "may be" as used in the italicized portion above set out, were not meant as a positive assertion applicable in all cases, then, in any event, the author cannot be said to hold anything contrary to the conclusion reached herein.

We are lead to the same conclusion, heretofore stated, by a further examination of our statutes. Section 17-107, supra, states, as already mentioned, that "neither shall any shares be issued which shall be exempt from bearing their pro rata portion of loss." If a person is a shareholder, he is, of course, a member of the association according to the express provisions of section 17-106, supra. Is a savings certificate holder a

shareholder? Light on that subject is thrown by the provision of section 17-112, supra. That provides as follows:

"No building and loan association as defined in this article, shall accept for deposit any demand, commercial or checking account and no such association shall receive any savings account or any sum of money on deposit without issuing shares of stock or savings certificates."

The bill, as originally introduced, did not contain the last three words, but it was amended in the house by adding them. H. J. 1927, p. 342. The Supreme Court of California had occasion to examine the relation of guarantee reserve stock, shares and savings certificates in the case of In Re Pacific Bldg.-Loan Association, 15 Cal. (2d) 134; 99 Pac. (2d) 251, though under a statute somewhat different from ours. The statute in that state expressly provided that savings certificates should have preference over shares, and the main question was as to the relation of shares to the guarantee reserve stock. Nevertheless, what the court stated is interesting here, inasmuch as it placed shares and investment certificates, as much as the statute permitted, on the same footing. We take it that investment certificates and savings certificates are much alike. It is stated in part, after comparing shares and investment certificates under the statute: "There is an obvious legislative purpose to treat these forms of investment in most cases as substantially similar in so far as the rights of investors are concerned. * * * In short, it appears that the membership shares are fundamentally similar to the investment certificates, and the differences noted are not of such significance as to overcome this similarity in respect of the rights of the investor against the association. We conclude that the membership shareholders are creditors of the association. * * * As we have already shown, the marked similarity be-

tween membership shares and investment certificates would under the language of both these cases, suggest the denial of preference (as to the guarantee reserve stock) rather than the giving of them." We may note the strong insistence of the court that the investment certificate holders and shareholders are similarly situated. Under a statute like ours, the court would undoubtedly have held them to be on the same, identical, footing, since our statute contains no provisions distinguishing shareholders and savings certificate holders. In the California case, it is true, the court held both investment certificate holders and shareholders to be creditors, but we are precluded from doing so by the provisions of section 17-106 which expressly makes shareholders members of the association. And if they stand on the same footing as savings certificate holders, then, of course, the latter must also be held to be members of the association, and they all must share the losses equally. We have already referred ot the Washington case of Rummens vs. Home Savings and Loan Ass'n., 182 Wash. 539; 47 Pac. (2d) 845, which, like the California case, held shareholders to be depositors, that is to say creditors, and yet held them all subject to the fundamental principle of equality applicable to building and loan associations. And, in First National Bank vs. Dawson County, 66 Mont. 321; 213 Pac. 1107, the court, speaking of building and loan associations—though the case involved a different question from that in the case at bar,—the court remarked: "In passing, it is well to note that virtually there is no difference between 'members' and 'depositors' as these terms are employed in the statute." There was a purpose in adding to the provision of section 17-112, supra, that no building and loan association should receive any money on deposit without issuing shares of stock, the phrase "or savings certificates." This provision was added deliberately by amendment, as already noted. If,

as contended by plaintiff the relation of creditor and debtor was created, in the sense contended for, the addition would not seem to subserve any particular purpose. An open account, a plain promissory note, or any other evidence of indebtedness would be just as effectual in creating such relation. If that relation was intended to be created thereby, it is strange that no hint of that is found in section 17-109, supra, which provides from whom and the manner in which the association may borrow money. We conceive of no reason for the addition except the deliberate intent of the legislature to place shareholders and savings certificate holders upon the same footing, and as substantially meaning the same thing, just as in section 17-101, supra. That section provides that a corporation which obtains money from its "members, shareholders, or savings certificate holders," is a building and loan association. Section 17-106 provides that membership consists of persons holding shares. Hence, the terms "members," "shareholders" as used in section 17-101 are tautological, if only shareholders are members. Since we must, if we can, give a meaning to all the terms used in the statute (59 C. J. 992, 995), we should not assume such tautology, and should, accordingly read the phrases used in that section as reading "members, that is to say shareholders or savings certificate holders," which would, of course, make savings certificate holders members. In any event, a building and loan association is created under that section when an association raises funds from shareholders or saving certificate holders. The terms are used interchangeably or at least the effect is the same. We should put the same construction on these terms as used in section 17-112, supra. The meaning of a word, or term, used in a statute must be construed in connection with the words with which it is associated. 59 C. J. 979. There is an old maxim "noscitur a sociis" (it is known by its as-

sociates). 46 C. J. 496. For instance it is said in People vs. McKean, 76 Cal. App. 114; 243 Pac. 898, 900: "The word 'notice' in its broadest significance, doubtless includes any means whereby intelligence of knowledge is communicated. But, according to the rule of interpretation, 'noscitur a sociis,' the world should be construed in connection with its associated word 'advertisement,' thus giving to each a kindred meaning." The issuance of shares of stock would, of course, as stated, make the holder thereof a member of the association. We cannot believe that when "or savings certificates" is, by the statute, directly associated with "shares of stock," it meant to describe something entirely different from and foreign to the latter. We think that, in the language of People vs. McKean, supra, the terms are "kindred." Moreover, the meaning to be given to the language used in a statute should be that which best effects its purpose. 59 C. J. 963. Borrowing money by a building and loan association (aside from the collections made from its members) is at best exceptional, and not the rule. As stated in Re Assigned Estate of National Building and Loan Association (Pa.) 9 W. N. C. 79, "a building and loan association has but few creditors strictly so-called; the organization is in fact and in law a partnership with corporate rights." We do not think that the term "savings certificates" was meant to represent the exceptional rather than the usual, for in a case like that at bar, in which all or most of the claimants are situated alike, that construction would entirely destroy the fundamental purpose of building and loan associations, and of the statutes creating them, namely that of equality. We think that the construction here given the term is more in consonance with the purpose and intent of the statute. The fact that the savings certificates are not in the usual form of certificates of shares of stock is not determinative of the question. No such certifi-

cates were essential to make the plaintiff a member of the defendant association. Sundheim, supra, sec. 45. Certificates of stock are but evidence of membership. Exchange Nat'l. Bank vs. Receiver of Bldg. and Loan Ass'n., 95 Colo. 498; 37 Pac. (2d) 394. It may be noted in this connection that the term "share" does not necessarily mean a share evidenced by a certificate of stock in the usual form, but may mean "a part or definite portion of a thing." 57 C. J. 560. The term is ordinarily used in the statute without the addition of the words "of stock." Thus in section 17-106 it is stated that membership in the association consists of persons holding "shares" therein. Sec. 17-107 states that no "shares" shall be exempt from loss. There is no particular reason, accordingly, why the term may not, under the circumstances herein, be construed to mean a part interest in the association, either evidenced by a certificate of stock or a savings certificate. It is, of course, true as argued that the plaintiff could not be compelled to become a member of the defendant association without his consent. But, no formal contract was necessary. Nat'l. Savings Fund and Bldg Ass'n. vs. Robinson, 19 Phila. 358. Plaintiff accepted the certificates sued on while the law of 1927 was in force and effect. He is deemed to have had knowledge of that law, and must be held to have accepted his certificates with the conditions and limitations affixed by the legislature.

And looking at the situation from a broad standpoint, the plaintiff is not unjustly dealt with by our holding. His counsel argue that the defendant would be unjustly enriched, if he were not given judgment for the claims sued on to their full extent. But, obviously, the principle of unjust enrichment cannot apply in favor of one who himself attempts to be unjustly enriched at the expense of those who are situated like himself and who would, if his claim were enforced, be

actually enriched at their expense. And, we see no particular reason why the defendant association should not be able to resist such unjust enrichment of the plaintiff on behalf of those, its members, who are situated as he is. This is not an ordinary case in which there are many share and stockholders and but few creditors, as stated in Re Assigned Estate of the Nat'l. Savings, Loan and Bldg. Ass'n., supra. Here, substantially, everyone is and was in the same situation as the plaintiff; they are all lenders or they are all members. Counsel for plaintiff disclaim that they seek a preference over others. But the disclaimer does not correspond with the facts as they would be if his contention were sustained. We have already referred to the fact that originally depositors in savings banks were considered members and not creditors. True, these institutions did not have a capital stock, while in this case, defendant association has. But the difference between them is not great. As we have already seen, under our statute the profits are in the main for the benefit of the ordinary shareholders (aside from the holders of the guarantee reserve stock), and the losses must be borne ratably. The articles of incorporation of the defendant were modified and amended by the statute itself to conform to these provisions, which, if not carried out, could, of course, have been enforced in the proper action. Misunderstanding or not following a law does not change it. The main difference between building and loan associations coming within the provisions of article 1, supra, and savings banks as they originally existed, is that the guarantee reserve stock shares in the profits and may be entitled to an extra dividend. But that was to the distinct advantage of the ordinary shareholders, for the guarantee stock is held for their protection, and the holders thereof cannot be paid until all others are satisfied. The sum of $100,000. originally belonging to the holders thereof has been lost

to them, and has been used for the protection of the investors, including plaintiff, lessening their loss by nearly ten per cent. In Bunnell vs. Savings Society, 38 Conn. 203, which considered a savings bank as these institutions existed originally, it appears that a loss was sustained by reason of the defalcation of some money by some officer of the bank. The court held that all depositors must share in the loss equally. The court stated in part:

"The assets this institution now has belong substantially to the present depositors. How can he obtain his loss? Shall he be paid out of their money? They have an equal right to be paid out of his."

Is not that the identical situation here? It would seem that it is.

If the defendant association had, when it became insolvent, gone into bankruptcy, or had taken other, equivalent, steps in insolvency, plaintiff would have been compelled, willy nilly, to share equally with those who are situated as plaintiff is. 45 Am. Jur. 186; 19 C. J. S. 1291; Fletcher, supra, vol. 16, pp. 279, 589; Kisk vs. White, 50 Ariz. 103; 69 Pac. 242. That would have been true also, without taking such legal steps, under the rule in force in most of the jurisdictions, in which it is held that the property of corporations constitutes a trust fund in favor of creditors, at least when the corporation has ceased to do business. 19 C. J. S. 1116-1117; Fletcher, supra, vol. 15, pp. 59, 89, 93. See Harle Haas Drug Co. vs. Rogers Drug Co., 19 Wyo. 35; 113 Pac. 791; Ann. Cas. 1913 E. 181. In view of these rules, it is quite apparent that the only reason why plaintiff has been able to assert the claim made herein with some degree of plausibility, is at most the fact that defendant omitted to take the proper legal steps to enforce equality among the claimants to its property, and we are not at all certain that such omission is not,

under the circumstances, a mere technical point in so far as the fundamental equities of the claimants are concerned, and an omission which hardly furnishes a particularly just criterion for a claim for preference which does not exist otherwise. Moreover, plaintiff had done business with the defendant association for many years, apparently since 1923. He held an installment savings certificate, or certificates. These certificates were of the same nature as the certificates sued on —they were loans, if the certificates sued on are loans. The statute of 1927 wrought no particular transformation in the nature of the defendant's business, except as to certain details. Its foundation as a building and loan association had already been laid by its articles of association, and by its by-laws, of which the plaintiff had notice—if not otherwise, then through the installment certificates and through certificate No. 303 sued on herein. The certificates in suit bear, as already stated, earmarks of a building and loan association. It is hardly probable that during all the years plaintiff was doing business with the defendant, he considered himself a lender of money to the defendant. An institution like that of the defendant is not an institution to which individuals usually loan money, in the strict sense of the term "loan." A man making an actual loan would hardly be willing to depend for payment on the ability of the borrower to return the money, limiting his right to receive payment at any one time "to half of the funds in the treasury of the association," as provided in the certificates sued on. That the certificates sued on constitute a loan was, we think, an afterthought of counsel, whose laudable ambition to protect the interests of their client we can admire, but cannot further except as the law and justice permit. It is unfortunate, of course, that plaintiff should lose any part of his hard-earned savings, but he is no more unfortunate than his fellow investors who are situated as he is.

Justice is due to them as well as to plaintiff, and to give him an advantage over them would hardly be weighing their rights on an even scale. If defendant association were actually an ordinary, private corporation, then it may be that the plaintiff should be able to obtain a preference over those situated as he is, but only on account of the greater care and diligence in attempting to protect his interests. Merchant's Nat'l. Bank vs. McDonald, 63 Neb. 363; 19 C. J. S. 1116. But he cannot be permitted to do so, when the statute plainly and unequivocally has determined that the defendant association is a building and loan association, the members of which are governed by the fundamental principle of equality.

It remains to determine what judgment should be entered herein. Plaintiff was not, of course, compelled to sign the agreement in connection with the so-called reorganization of the defendant, waiving 30% of his deposits. But, as far as we can see, that agreement is effectual only between the signers and the Reconstruction Finance Corporation, and would make no difference as between the other investors and the plaintiff, in view of the issuance by the defendant of the so-called recovery certificates. Plaintiff insists that he is entitled to judgment herein for the full amount claimed notwithstanding the insolvency of the defendant. But in view of such insolvency at the time when plaintiff gave notice to withdraw his money, we could not, in any event, let the judgment stand except only in so far as to put the plaintiff on a footing of equality with those situated as he is. He could not by his withdrawal gain any preference over those situated like him. Sundheim, supra, sec. 193. Counsel for plaintiff rely on O'Rourke vs. Grand Opera House Co., 47 Mont. 459; 133 Pac. 965, cited in Fletcher, supra, section 7367. That was a case involving an ordinary corporation, not one affected with a public interest as is the association

in the case at bar, and the plaintiff was a creditor, not a member of the corporation. In the later case of Davies vs. Montana Auto Finance Corporation, 86 Mont. 500; 284 Pac. 267, the court, following the O'Rourke case, entered judgment in favor of the plaintiff in an action against an ordinary corporation, stating, however, that the claims of creditors would not be enforced if others are injured. In the case of Re Nat'l. Bldg., Loan and Provident Ass'n., 12 Del. Ch. 93; 107 Atl. 453, it was held that "when a withdrawing member of a building and loan association recovers a judgment against the association for the amount due him, he becomes a creditor of the association and is entitled to payment as such in preference to the members thereof" even though at the time when the notice of withdrawal was given the association was insolvent. Hence, judgment should not be entered in this case if that preference should not be given, as we hold. It has been held a number of times that the procurement of a judgment by a withdrawing member does not give a priority over others if at the time notice of withdrawal was given the association was actually insolvent. Chapman vs. Young, 65 Ill. App. 131; Re Nat'l. Savings Loan and Bldg. Ass'n., 9 W. N. C. 79; Educational Soc. vs. Gordon, 310 Pa. 470; 166 Atl. 499; Manheimer vs. Henderson Bldg. and Loan Ass'n., 24 Ky. L. Rep. 1816; 72 S. W. 313. See note 98 A. L. R. 122. In Stearn vs. Bldg. and Loan Ass'n., 100 Pa. Super. Ct. 561, a summary judgment in favor of a withdrawing member of an insolvent association was reversed. See also Stone vs. New Schiller Bldg. and Loan Ass'n., 302 Pa. 544; 153 Atl. 758. In Teller vs. Wilcoxen, 110 Iowa 565, 81 N. W. 772, it was held that in case of insolvency "no right of action existed on this certificate (held by plaintiff) against the association, as would have been the case with a note or bond. The holder could only withdraw his money as provided by the by-laws. If

this right were refused, his remedy would be in equity to wind up the corporate affairs." We think that in order to effectuate the equality heretofore mentioned the judgment entered herein in the trial court should be modified to conform to this opinion.

The plaintiff, however, is entitled to be put into a position of exact equality with those situated as he is. The record shows that the others (or 92% of them) have been paid 64% of the principal and interest due them as of January 1, 1934. The exact date of payment is not shown in the record. It was probably during 1935 and partly, perhaps, in 1936. The defendant deposited 64% of the amount due the plaintiff as of January 1, 1934, with the clerk of court in favor of the plaintiff after the trial of this case and about the time when judgment was entered. No interest from January 1, 1934 was included. The defendant in its answer pleaded that it offered to pay to the plaintiff the same percentage as was paid to the others but that the plaintiff refused to accept it. The offer to pay was admitted in the reply. It does not appear that the offer was followed by an actual tender of the money, as seems to be necessary to constitute a legal tender. See 62 C. J. 668. Section 89-1220, Rev. St. 1931, provides:

"If, in an action on contract for the payment of money, the defendant answer and prove that he did tender payment of the money due on the contract, at any time before the commencement of the action thereon, and pay to the clerk, at any time before trial, the money so tendered, the plaintiff shall not have judgment for more than the money so tendered and due, without costs, and shall pay the defendant his costs."

The defendant did not comply with this statute, but waited to deposit the money until after the trial. Moreover, this is not an ordinary case involving the tender of money. In fact, we have found no authority which holds that the law of tender applies to a situation such

as that before us. The plaintiff had the right to have the State Examiner take possession of the affairs of the defendant association as provided by section 17-118, Rev. St. 1931—it is too late now and could conserve no good purpose as far as we can see. If that had been done, this suit would probably never have been instituted. In the absence of the State Examiner taking possession, or proceedings similar thereto, it can hardly be said that plaintiff's conduct in not accepting the money offered him by defendant was censurable. It appears to be a general rule, without attempting to state exceptions or particular applications, that when property of an insolvent corporation has passed into custodia legis, interest on obligations ceases, unless the property is sufficient to pay it. Glenn on Liquidation, sec. 488; 46 Am. Jur. 204-205; Annotations, 39 A. L. R. 457; 44 A. L. R. 1170. In the case at bar, the property never passed into custodia legis. And, we have searched in vain for authorities holding that an insolvent corporation has power, at least when it is not dissolved as provided by statute, to determine for itself, without some proceeding according to law, how much of the principal and interest due to claimants it will pay, and force rightful claimants to accept such determination. Hence, it would seem that equitable considerations should prevail in determining plaintiff's rights. As already stated, 92% of the claimants, situated like plaintiff, have had the use of money paid to them, and seemingly the only way, or the only practical way, by which plaintiff may be put upon an exact footing of equality mentioned is to allow him a reasonable rate of interest, per annum, not exceeding the rates fixed in his certificates sued on, from the time when the others were paid to the time when the money was deposited in court, and on the same percentage of the amount due as of January 1, 1934, as was paid to the others. To illustrate: If, say, 32% of the amount due the others

was paid to them on July 1, 1935, then, interest should be allowed to plaintiff on 32% of the amount due him as of January 1, 1934, from July 1, 1935, to the time when the money was deposited; and if the remainder of 32% was paid to the others on January 1, 1936, the interest should be paid to plaintiff on 32% of his amount from that time until the deposit was made. If counsel cannot agree on the amount the court should fix it, and it may make any other order, if necessary, which will put the plaintiff upon a footing of equality with those who are situated as he is, including, of course, equality in future distributions of the money, if any, which may be made by the defendant.

We think that the trial court should set aside the former judgment entered herein, and enter another judgment, and proceed in the case, if necessary, not inconsistent with this opinion. The costs in the trial court and in this court should be evenly divided between the parties thereto, and no costs should be taxed for the briefs filed in this court. An order will be entered accordingly.

*Judgment set aside.*

KIMBALL, Ch. J., and RINER, J., concur.

### PETITION FOR REHEARING

(No. 2234; Oct. 12, 1943; 141 Pac. (2d) 856)

*Mahlon E. Wilson,* of Salt Lake City, Utah, and *W. E. Mullen,* of Cheyenne, in support of petition for rehearing for respondent. There was a brief filed by *Messrs. Wilson* and *Mullen.*

188

BLUME, Justice.

A petition for a rehearing has been filed herein, accompanied by an exhaustive brief. Perhaps the case may be said to be in the twilight of doubt. At least it gave the writer hereof considerable trouble upon the original investigation, so that the petition for rehearing is welcome herein, giving us an opportunity to again consider the questions involved and briefly review, herein, the main and essential points for ultimate decision, without saying that every statement in the original opinion was correct, for it presents a number of complicated points.

1. Counsel again argue that the defendant cannot collaterally attack its original articles of incorporation. But, these original articles no longer exist, and hence no attack could be, or is made, upon them. Sec. 17-119,

Wyo. Rev. St. 1931, changed these original articles, and modified them in so far as inconsistent with the statute. We cannot ignore the plain reading of the statute.

II. Counsel also again argue that the deposit made by the defendant in court estops it to question the fact that the plaintiff is a creditor of the defendant. We think that the authorities cited in the original opinion show that counsel are in error. This case illustrates that error. From the very beginning of the case, commencing with the answer filed by the defendant, and throughout the trial in the lower court, and in this court, the defendant has insisted, and based its defense on the fact that the plaintiff is a member of the defendant association, and not a creditor. It would seem to be rather strange that such express claim, so insisted on throughout, could be wiped out by a deposit in court, which, at most, could be considered an implied admission. We do not think that the law recognizes such anomaly.

III. Counsel argue, as they did in the case originally, that even though the corporation borrowed money, without being authorized to do so, still it cannot question its power in that regard, and that under the doctrine of unjust enrichment, it must pay the money back. We conceded that in the original opinion, citing Lander State Bank v. Putnam, 40 Wyo. 312; 276 Pac. 926. At least we did not question that rule. But the whole comes back to the point: Was the money which was deposited by the plaintiff a loan, or did he become a member of the defendant association?

IV. The crucial questions in this case are (a) whether or not the defendant became, under the law of 1927, a building and loan association, and (b) whether or not the defendant is a member thereof, rather than a creditor. We discussed both of these questions exhaustively in the original opinion, and came to an

affirmative conclusion in both instances. The difference of opinion between counsel for plaintiff and this court lies in the fact that counsel will not, or refuse to, give to our statutes the force and effect which this court has felt constrained to give them. In other words, the whole case hinges on a matter of statutory construction. We may briefly recapitulate the reasons why we feel compelled to adhere to these conclusions. The statute states that a corporation which issues savings certificates is a building and loan association. The evidence shows that the defendant issued such certificates, and apparently nothing except such certificates. These major and minor premises being unquestioned, it follows by the inexorable laws of logic that the defendant is a building and loan association under the statute, and no amount of argument to the contrary can overcome that inevitable conclusion. We are unable to see the force of the contention that the statute intended to affect only building and loan associations which were completing their existence under the act of 1890. No such indication is contained therein. In fact, as we pointed out in the original opinion, the bill for the act of 1927 was intended to supplant all legislation whatever on the subject and be inclusive of all corporations doing business like that, or similar to that specified in section one of the act, and by amendments, made only two exceptions, namely those relating to corporations organized under what are now articles 2 and 3 of chapter 17, Rev. St. 1931. Not only is section 17-101 of the Rev. St. 1931 all inclusive with the exceptions named, clearly embracing all hybrid organizations such as the defendant was, but it is further provided by section 17-119 that a corporation doing business similar to that specified in article 1 chapter 17 of the statute shall be a building and loan association and governed by the provisions of that article. Not only did the defendant do a business similar to that contemplated in that arti-

cle, but it did the very identical business so contemplated. Counsel argue that the statute could have no such far-reaching effect, as, on its face, it has, for the reason that it would change the defendant association fundamentally, and that such fundamental change is not permissible. It may be mentioned in this connection, that the stockholders in control of the corporation at the time when the act of 1927 was passed are not here complaining of the change wrought by the statute. Aside from that, counsel conceive the main purpose of the defendant to be to have a fixed capital stock, and through it to have the control of the company. We may admit that the legislature would not be authorized to make a fundamental change in the corporate defendant, Drew v. Beckwith, Quinn & Co., 57 Wyo. 140; 114 Pac. (2d) 98. But, the change mentioned by counsel is not such, we think, as to come within the definition of a fundamental change, at least so far as plaintiff is concerned. Articles of incorporation are amended daily changing the capital stock, or even changing the control of the association. A fundamental change would exist, if the business of the association were entirely changed—if, for example, a sugar company were transformed into one for ginning cotton. In this case, one at least of the purposes for which the corporation was organized, was to do business as a building and loan association. Its capital stock was left unimpaired by the statute; only additional, and different kinds of shares of stock were permitted to be issued, thus giving the control of the company to all of the holders of the various kinds, thereof. We think no fundamental change, of which plaintiff can complain, was made. See 13 Am. Jur. 240; Fletcher Cyc. of Corporations (Permanent edition) Vol. 7, sec. 3696.

In view of the fact that it cannot be disputed that the defendant association is a building and loan association, it would seem to be clear, that we must neces-

sarily find that the plaintiff became a member of it. As we pointed out in the original opinion, the defendant (aside from the guaranty stock) issued nothing but saving certificates, either on the installment plan, or on the paid-up plan. That fact appears to be undisputed. Hence, unless they are members, there would be nothing, to which the theory applicable to building and loan associations of treating investors in such an association on a footing of equality, could apply. In other words, in such a case, the defendant, shorn of the power, or duty, of treatment of equality, could hardly be said to be a building and loan association, in spite of the fact that by express provisions of the statute it is made so. That would be an anomalous situation. But holders of savings certificates are, under the statute treated as share-holders. We made such an exhaustive analysis of the statutes relating to that point, that it seems to us that an unprejudiced study thereof, and of the statutes in question, must lead to the result at which we arrived. Savings certificates are only mentioned in section 17-101 and 112, Rev. St. 1931, in which, clearly, the holders of savings certificates are treated and considered as share holders, and as synonymous therefor. We can conceive of no purpose of mentioning savings certificates at all, unless that is true. Section 17-107 provides in detail, what "shares" the association may issue. The savings certificates issued by the defendant correspond to these shares, except only that they were not denominated as such. If these certificates had been intended to represent anything different from shares, it would seem to be clear, that in view of the fact that they are specifically mentioned in section 17-101 and 112, specific provisions would have been made for them, just as specific provisions were made for "shares". But, that was not done, leading, again, to the conclusion that the term savings certificate, was intended to be but another name for a cer-

tificate of shares. It is doubtless true that section 17-112 was partially intended to prevent a building and loan association from doing a banking business. But, it does more than that. It does not, as correctly contended, expressly forbid a corporation from borrowing money. But it clearly states that when it receives a deposit, (and it impliedly authorizes it) it shall either issue shares of stock or the equivalent thereof, namely savings certificates. In other words, the statute provides that a depositor shall not be considered a creditor, but a member, and, as we pointed out in the original opinion, Sundheim, Building and Loan Associations (3rd Ed.) sec. 44 appears to take the same view under such a statute. Counsel seem to argue, that even though the receipt of the money by defendant was ultra vires, it must be repaid. They insist that it is a loan; in their judgment there can be no question about that. We are sorry that, in the face of the statute, we cannot take that view of it. In view of such a statute, cases like Western Bond and Mortgage Co. v. Crown, 112 Ore. 663; 231 Pac. 138, upon which counsel lay so much stress, can obviously, have no application. What counsel for plaintiff have failed to recognize, or rather refuse to recognize, is the fact that in this case, all parties interested in the defendant association (outside of the holders of the guaranty-stock who do not seem to have any interest in it at all any more) are all situated alike—they are either all creditors or all members. That fact distinguishes this case from all those upon which counsel rely, and which we considered in the original opinion, as showing that plaintiff became a creditor. Even if it were true, as counsel contend, that the defendant was authorized to borrow money from parties other than a like association, as mentioned in section 17-109, Rev. St. 1931, still, section 17-112 provides that a depositor shall not be considered a lender, and, hence, definitely excludes the plaintiff, who un-

questionably was a depositor, from becoming a creditor. Counsel say that 99 per cent, nay even 100 per cent, of men "would believe that the transaction carried on between plaintiff and defendant was a loan, and it requires a great deal of legal ingenuity to denominate these transactions as anything else but a loan." We do not think that it takes a great deal of legal ingenuity to say that a deposit is not a loan, when the statute says that it is not a loan. Counsel state that as early as 1923, the plaintiff "loaned" money to the defendant. That was upon one of the installment savings certificates, and counsel put that on the same footing as the paid-up certificates issued to plaintiff later. Now, it can scarcely be doubted that these installment savings certificates bear all the possible indicia of a building and loan association, except only that they do not state that they represent "shares". How it is possible for counsel to contend that under them the plaintiff thought he was making a "loan" to the defendant in the ordinary sense of that term, is beyond our understanding. And, as pointed out in the original opinion, the paid-up savings certificates in evidence in this case bear signs of savings certificates of a building and loan association, in view of the fact that the plaintiff must have known that the defendant was not a savings bank. If plaintiff thought that he was making a "loan" to the defendant, why did he not take a promissory note or bond, as men generally do when they are making a "loan," or, on the other hand, deposit his money in a savings bank? It stands to reason that in view of the fact that plaintiff knew that defendant was not a savings bank, he knew that it was doing, or at least was attempting to do business on the building and loan plan, and that as such, the "loan" had limitations attached thereto, leaving even out of consideration the fact that he must have known, that the defendant was lending money on the building and loan plan to the

extent of a million dollars or more to doubtless numerous parties for building their homes, as provided in the by-laws of the defendant. We cannot agree that plaintiff is so innocent a holder of savings certificates, which he expected to be paid like a promissory note, as counsel would have us believe. The unfortunate part for plaintiff, in brief, is that he holds savings certificates, instead of promissory notes, and that these savings certificates make him, under the statute, a member of the defendant association and not a creditor. Moreover, if there were any serious doubt about it, how should this court, in all fairness, resolve that doubt? Here we have persons investing more than a million dollars in the defendant association. All, as the record indicates, are in the same situation; they all have certificates of the same general nature. The fundamental principle governing building and loan associations is to treat all situated alike on a footing of equality. Equity demands that. We think there can be but one answer to the question which we have put. We are, accordingly, constrained to adhere to our original opinion that the plaintiff became a member of the defendant association, and is entitled to stand upon the same footing as other shareholders, except those holding guaranty stock who are not entitled to anything until all others are satisfied. This states the gist of the conclusion in the original opinion and required the setting aside of the judgment herein, although there would have been no harm in letting the finding of the trial court stand in so far as it relates to the amount which the plaintiff deposited. There is, however, no dispute on that point, and never has been.

V. Various arguments are made by counsel in the sixth point of their brief in support of their petition for rehearing. Counsel take exception to our statement contained in the original opinion to the effect that we can see no reason why the defendant association should

not be able to resist an unjust enrichment of plaintiff on behalf of its members situated like plaintiff. They have not cited any cases to the contrary. They say that they have found no case where a corporate defendant when sued, has been permitted to resist judgment on the ground that the judgment will give the judgment creditor an advantage over other creditors. But that does not answer our statement. We are not dealing in this case with creditors. We are dealing here with members of an association affected with a public interest, and whose rights are defined by statute. We can hardly believe that it is the duty of a corporation, particularly one affected with a public interest, as is a building and loan association, whose rights and duties are defined by statute, to stand idly by, and permit one of its members to gain an advantage over the others to which he is not entitled. And, there is ample authority in the books of law to sustain that view and to uphold the statement criticized by counsel. Allman v. Bldg. and Loan Ass'n., 100 Pa. Sup. Ct. 205; Weil v. Bldg. and Loan Ass'n., 100 Pa. Sup. Ct. 550; Stern v. Bldg. and Loan Ass'n., 100 Pa. Sup. Ct. 561. The last of these cases was cited in our original opinion. In all of these cases, the building and loan association, not in custodia legis, resisted a suit by a member who sought to obtain a judgment against the association, just as in this case, on account of the insolvency of the association. In all of them a judgment was rendered for the claimant, and in all of them the judgment was reversed, just as we set aside the judgment in the case at bar. In Stone v. Bldg. and Loan Ass'n., 302 Pa. 554; 153 Atl. 758, the court stated: "A withdrawing member can obtain no advantage or priority over his fellow members through suit, and judgment under such circumstances; * * * a judgment is ineffective for any purpose except that it may hasten further liquidation. If the association were liable to judgment and execu-

tion at the hands of every withdrawing shareholder, it would result in a race for judgment whereby the assets would be eaten up through forced sales." And see O'Rourke v. Bldg. and Loan Ass'n., 93 Pa. 308; Andrew v. Bldg. and Loan Ass'n., 98 Va. 445; Teller v. Wilcoxen, 110 Ia. 565; 81 N. W. 772. If, then, a judgment is ineffective, it was at least our duty to declare that in this case. But, that is substantially the same as setting the judgment aside, as was done in the three cases above mentioned. We are not certain that we understand some of the statements and arguments made by counsel in connection with their sixth point. They say, for instance, that in view of the fact that 92 per cent of the investors in the defendant association agreed to the liquidating scheme inaugurated in 1934, they cannot be said, though they receive only 64 per cent of their money, to have been injured, if the plaintiff receives 100 per cent. That statement, we cannot believe, was made seriously. They further argue that the question as to whether or not the plaintiff would obtain a preference over others situated like him cannot be determined without bringing all persons of that class into court; that a trial should be had as to the extent of the amounts which they have advanced to the defendant, what their relations were, and that the assets should be marshalled and distributed on an equitable basis. Apparently, counsel meant to exclude from this the parties who agreed to the liquidation, for they say that they should be permitted to go ahead with their liquidation, and that plaintiff, and others who did not agree to the liquidation should receive their money from the $50,000. held in the banks. No marshalling of assets would be necessary as to the parties who agreed to the liquidation, under the limitation mentioned by counsel, for they have agreements settling their mutual rights. Nor would it be necessary, on plaintiff's theory, to

bring into court parties other than the plaintiff who did not agree to the liquidation, or marshall any assets as to them, for the evidence shows that the sum held in the banks is sufficient to pay them. So, we are somewhat at a loss to know why these arguments have been made.

Counsel say, in connection with their sixth point, that this is an action at law; that insolvency is not in issue in this case; that no equitable defense was set up; that if this court should hold that plaintiff is not a creditor, but a member of the association, as we do, the only order we should enter is to reverse the judgment, except as to the amount paid into court. Apparently, therefore, counsel object even to what we stated in connection with the allowance of interest to the plaintiff. Of course, if the insolvency of the defendant is not in issue in this case, then we were wrong in setting the judgment of the trial court aside. If the defendant is solvent, or must, for the purpose of this case, be so considered, then the judgment of the trial court should stand, since in that event no defense to the action would exist. It would make no difference in such case whether the plaintiff be considered a creditor or a member. In either case, the amount awarded would be due to the plaintiff under the facts in this case. But the question of insolvency was one of the main and basic defenses set up by the defendant, and is, we think, sustained by the evidence. In view of the fact that defendant was, as we hold, a member of the defendant, and in view of the statutory provision that such members must share the losses equally, the defense of insolvency, we think, was an equitable defense, for equality is essentially a principle of equity, and though the plaintiff commenced his action as one at law, it was, for practical purposes transformed into one of equity. When a

similar contention as here was made in Novosel v. Sun Life Assurance Co., 49 Wyo. 422; 55 Pac. (2d) 302, we said:

"Counsel say that this is purely an action at law, and no equitable principle has been invoked. They are in error in both contentions. The facts which required the application of the rule were stated in the intervener's petition. Nor is this purely an action at law, as we have pointed out many times. The distinctions between actions at law and suits of equity were abolished and we have only a civil action. Sec. 89-301, Rev. St. 1931. Legal as well as equitable principles alike are administered in this action, depending upon the facts. When the facts present a case requiring the application of principles heretofore known as equitable, it is the duty of the court to apply them. If principles of law and equity both appear in the case, the latter must be given preference, unless, perhaps, a positive statute forbids."

And, what was stated in Urbach v. Urbach, 52 Wyo. 207; 73 Pac. (2d) 953 is apropos. There we stated:

"In this state, with its system of Code pleading, these courts administer all law—the common law, statutory law, and principles of equity, and all in the same suit. These branches of the law are of equal dignity; the rules thereof, if in fact in force, are on a parity, although the facts may require resort to one or the other, or others, of these branches. It is sufficient, in order that the court may act, that power exists under any of these rules, and that the pleadings and the facts warrant the exercise of power in a particular case. It may well be said that we have but one system of law, consisting of the common law, in so far as applicable, statute-law, and principles of equity. That is the objective field from which the court picks out those particular principles which are applicable in the particular case before it. The court reaches out into this broad field of law, and picks out the appropriate principles which fit the pleadings and the facts, whether such principles

are found in one statute or another, or in the common law or among the rules of equity."

So, in this case the court was accordingly bound to reach out for and apply the principles of law or of equity warranted and required by the pleadings and the evidence herein. It appears in this case that 92 per cent of the investors, situated, as the record indicates, like plaintiff (aside from the fact that they agreed to the liquidation which cannot change the situation) received the sum of approximately $750,000 and that this constitutes but 64 per cent of their investments. Their total investment is, accordingly, approximately 36 per cent greater than that. Who the persons were who invested this money, or how much they severally invested is not shown, and was evidently not considered important, though, it would seem, that could easily have been shown, if the parties should have desired it, from the books of the defendant. At least, so far as the evidence produced was concerned, a clear case was presented that the plaintiff, as a member of the association, desired to obtain a preference over other members. If at that stage, the state examiner, or a receiver, had been in charge of the affairs of the defendant, it would have been clearly his duty to have raised the question of preference for a receiver—and we take it that the duty of the state examiner would have been the same— should protect the interests of all. See 45 Am. Jur. 154. As we have seen, the defendant had the right to raise the same point. And, the only question remains whether, under the peculiar circumstances, namely because of the fact that the defendant undertook to go into voluntary liquidation, instead of putting the property into custodia legis, the rule of equality, expressed by the statute, should be held not to apply. We have here a situation entirely different from any which we have found in the books. But, is equity, for the principles of which the court was required to reach out, when the

pleadings and evidence in the case warranted it, powerless to meet the situation? We do not think so. We hardly think that the statutory requirement, that of equality, can be nullified by the mere fact that the association's property has not been put into custodia legis. We know of no reason why equity should be thus fettered. The case of Stern v. Bldg. and Loan Ass'n., supra, and the cases cited above along the same line, are clearly in point. The reversal of the judgments in these cases led, substantially, to the same result as the result which we reached in this case. The case at bar was tried upon the theory that the plaintiff, as creditor, was entitled to a judgment in full, on the one hand, or that, on the other hand, he, as a member of the defendant association, was entitled to the same percentage of his claim as was, or will be, received by all other members. When, accordingly, it appeared that the defendant is a building and loan association; that it is insolvent, that the plaintiff is a member thereof, that many others are situated as he is; that to allow him judgment for the full amount asked for would necessarily be detrimental to the interests of the other members, the court was bound to reach out for the principle of equity —that of equality—contained in the statute, and no other order was possible than to set the judgment below aside. Contrary to the contention of plaintiff's counsel, that order is strictly in conformity with the theory on which the case was tried, except, possibly, in one particular. We did not agree with the theory of the plaintiff, nor did we wholly agree with the theory of the defendant in taking the position that the plaintiff was entitled only to the amount which the 92 per cent of the investors had received, but believed that in order to equalize the situation of the parties, the plaintiff should be allowed some interest. We could not avoid discussing the point if we did not want our position to be misunderstood. Possibly, we went further than ab-

solutely necessary, but a discussion to some extent was unavoidable. That is not to say that we meant our decision to be resjudicata as to the amounts which the persons interested severally invested in the corporation, or even the total amount thereof, or whether they are all actually situated similarly to the plaintiff. We but established the principles on which the assets of the corporation, past, present, or future, should be distributed. If plaintiff thinks that the actual amount which he would receive under these principles, would be greater by, for instance, having the state examiner now take possession of the affairs of the defendant and having these affairs wound up while in custodia legis, under the rules laid down by us, that presents another matter with which we were not authorized to deal in our original opinion, since, in that opinion, we were confined to the pleadings and the evidence produced in the case, and the theory on which the case was tried.

In view of the fact that we must adhere to our decision heretofore rendered on the controlling questions in the case, we can see no good purpose in a rehearing of the case, and the petition for it must, accordingly, be denied.

*Rehearing denied.*

KIMBALL, Ch. J., and RINER, J., concur.